HOWARD GILMAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gilman v. Commissioner
Docket No. 15585-87
United States Tax Court
T.C. Memo 1989-684; 1989 Tax Ct. Memo LEXIS 684; 58 T.C.M. (CCH) 1075; T.C.M. (RIA) 89684; December 28, 1989; As amended April 23, 1990 Robert H. Aland, Frederick E. Henry, Brett R. Keenan, for the petitioner. Laurence A. Hoch, Drita Tonuzi, and Roland Barral, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions to tax as follows: Additions to tax
Year
Deficiency
sec. 6659 [1]
sec. 6621(c)
1980
$ 171,680
--
applicable
1981
329,555
$ 98,867
applicable
Petitioner has conceded certain issues regarding the 1981 taxable year. The remaining issues are (1) whether petitioner's purchase of certain computer equipment should be respected for Federal *686 income tax purposes; (2) whether petitioner purchased and leased the equipment for profit within the meaning of section 183; (3) whether petitioner was at risk under section 465 with respect to his indebtedness; (4) whether petitioner used the appropriate method of depreciation; (5) whether petitioner's underpayment of tax is attributable to a valuation overstatement within the meaning of section 6659; and (6) whether the transaction was tax motivated within the meaning of section 6621(c) (formerly section 6621(d)). FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in New York City when he filed his petition. During 1980, petitioner was chairman of the board, chief executive officer, and sole stockholder of Gilman Paper Company, which had approximately 2,500 employees and annual sales of several hundred million dollars. Prior to the transaction in issue, Disko Leasing GmbH (Disko) purchased certain computer equipment (the equipment) that it leased to end users located in West Germany. These leases ended between mid-1982 and early 1985. The equipment *687 consisted of a Model 370-158-U33 and a System 34 manufactured by IBM Deutschland GmbH (IBM); two Systems 2950 manufactured by ICL Deutschland International Computers GmbH (ICL); a Model 62/35 manufactured by Honeywell Bull AG (HB); and a Basic/Four 730 manufactured by MAI International GmbH (MAI). Disko borrowed the funds to make the purchase from Dresdner Bank, which acquired the right to receive the rents payable to Disko by the lessees and also obtained title to the equipment as security for payment of the loans. This title would be automatically transferred to Disko upon full payment of the loans. Dresdner Bank's retention of legal title placed it in essentially the same position as the holder of a mortgage. The equipment was purchased on the following dates for the following prices: Purchase
Cost
Cost
Equipment
Date
Deutschemarks
Dollars
IBM 370/158
8/01/78
4,245,164
2,165,900
ICL 2950
11/16/79
1,121,171
572,026
ICL 2950
03/21/80
1,211,606
618,166
IBM Sys. 34
04/10/80
671,255
342,462
HB 62/35
12/17/79
559,569
285,494
MAI Basic Four
03/14/80
233,000
118,878
Total Cost
8,041,765
4,102,926
On December 30, 1980, Disko *688 sold its interest in the equipment to Equilease B.V. (Equilease) subject to the end-user leases and Dresdner Bank's security interest in the equipment. Equilease was an unrelated Netherlands corporation that intended to resell the equipment to individuals. The terms of purchase were a downpayment of DM 2,266,611 and semiannual installment payments of DM 4,190,737. Disko and Equilease also entered into lease agreements for terms of 9 years, under which Disko leased the equipment from Equilease for aggregate semiannual rental payments of DM 4,190,737. Disko remained obligated to make its lease payments to Equilease even if an end user defaulted in its underlying lease payments to Disko. If Disko defaulted on its lease payments, Equilease had the right to terminate the lease agreements with Disko and take possession of the equipment. Disko was responsible for maintenance, repairs, taxes, and insurance on the equipment. Upon written notice to Equilease, Disko could replace the equipment with similar computer equipment of equal fair market value. Equilease also entered into security agreements with Disko pursuant to which Equilease assigned to Disko its interest in the computer *689 equipment as security for its payment of the semiannual installments on the loan. If Equilease should default on the loan, its right to obtain legal title to the equipment would revert to Disko, which would have the right to terminate its lease agreements with Equilease. In November 1980, Joel Mallin (Mallin), an equipment broker who had put together hundreds of equipment leasing deals, informed petitioner's attorney, Bernard D. Bergreen (Bergreen), that Equilease was in the process of purchasing a substantial amount of computer equipment from Disko. Mallin prepared a series of financial schedules or "spreadsheets" which showed the financial and tax consequences of the transaction. There were only minor variations from one spreadsheet to another. The December 27 version of the spreadsheet (the only version introduced into evidence), Appendix A, was based upon the assumptions that the selling price of the equipment would be $ 3 million, and at the end of the lease the equipment would have a net residual value (after subtracting a 10-percent remarketing fee) of $ 600,000, or 20 percent of the selling price. This spreadsheet showed that petitioner would receive a $ 382,150 cumulative *690 net benefit, including tax benefits, from the transaction assuming a 5-percent after tax return on "use-of-money." This cumulative net benefit would be primarily due to petitioner's investment of the savings from the front-loaded tax benefits. Although the spreadsheet does not show this calculation, the use of the same methodology would have given petitioner a cumulative benefit of $ 142,150 even if the equipment had a zero residual value. Except for the spreadsheets, neither Mallin nor his staff prepared any documents, offering memoranda, descriptive brochures, or other promotional materials with respect to any of the proposals presented to Bergreen or petitioner. Petitioner first saw a preliminary copy of the spreadsheet in the first week of December 1980. After discussing the proposed transaction with Bergreen and inspecting several versions of the spreadsheet, petitioner decided on December 10 or 12 to proceed with the purchase. The transaction was structured so that Equilease first sold the equipment to Aardan Leasing Corporation (Aardan), an unrelated Delaware corporation, for $ 2,992,500. This sale occurred on December 31, 1980. The same day, Aardan sold the equipment *691 to petitioner for $ 3 million. Aardan was obligated to make payments to Equilease on the same dates and essentially in the same amounts that petitioner made to it, with the exception that Aardan retained a portion of the downpayment that it received from petitioner. Petitioner paid Aardan $ 45,000 in cash and gave Aardan an interest-bearing limited recourse promissory note in the principal amount of $ 2,955,000 that was secured by the equipment. Part of the interest payments on the note due in 1981 and 1982 were evidenced by separate short-term promissory notes, which themselves bore interest, due on April 30, 1981 and January 31, 1982. Pursuant to an arrangement entered into prior to closing, Aardan assigned the short-term notes to Intercontinental Monetary Corporation, an unrelated corporation, on the date of closing. The short-term notes were secured by letters of credit issued on January 15, 1981, by petitioner's bank, Morgan Guaranty Trust Company. Petitioner leased the equipment to Equilease for a term of 9 years, with Equilease responsible for maintenance, repairs, taxes, and insurance. Petitioner's obligations and expectations were as follows: 1980
1981
1982
1983-89
Downpayment on 12/31/80
$ 45,000.00
--
--
--
Annual Payments
Interest on 12/31/80
1,641.67
--
--
--
Monthly Interest of $ 33,000
--
$ 396,000
--
--
Monthly Interest of $ 34,250
--
--
$ 411,000
--
Monthly Interest and Principal
of $ 65,619.32
--
--
--
$ 787,432/yr.
Interest on 4/30/81 evidenced
by $ 195,000 short-term note
with interest of $ 12,452
--
207,452
--
--
Interest on 1/31/82 evidenced
by $ 180,000 short-term note
with interest of $ 37,145
--
--
217,145
--
Total Payments
$ 46,641.67
$ 603,452
$ 628,145
$ 787,432/yr.
Rent Receipts
$  1,641.67
$ 404,400
$ 419,400
$ 795,832/yr.
*692 Petitioner made total lump-sum payments of $ 469,597 during 1980 through 1982, consisting of the $ 45,000 downpayment on December 31, 1980, the $ 207,452 payment on the first short-term note on April 30, 1981, and the $ 217,145 payment on the second short-term note on January 31, 1982. All of these lump-sum payments, plus considerably more, were recovered through tax benefits from the transaction on petitioner's next tax returns. Petitioner also would receive an $ 8,400 net annual cash flow in the years 1981 through 1989 from the excess of rents over note payments, and the right to the equipment's net residual value at the end of the lease. Pursuant to a marketing agreement between petitioner and Equilease, Equilease would market the equipment at the end of the lease. Petitioner agreed to pay Equilease a fee equal to 10 percent of the proceeds from the sale or re-lease of the equipment reduced by reasonable expenses (including appraisal costs, repossession costs, packing and shipping costs, and attorney fees). In the alternative, petitioner, at his sole discretion, could elect to pay Equilease "an amount equal to such fees customarily charged (at the time of the applicable marketing) *693 by recognized concerns performing similar services in the computer leasing industry." Equilease ordered and paid for an appraisal of the equipment by Diebold Deutschland BmbH (Diebold), a West German computer consulting firm and the only appraiser that Equilease used in Germany. The appraisal was dated "As December 31, 1980" and was received by petitioner in January 1981. The appraisal, prepared by Fritz R. Muller (Muller), an employee of Diebold, was just over one typewritten page. The appraisal stated that (1) the $ 3 million selling price of the equipment was fair market value; (2) a reasonable estimate of residual value at the end of the lease was $ 600,000, or 20 percent of the selling price; (3) the equipment would have a useful life of more than 11-1/2 years from December 31, 1980; and (4) the rental payments represented a fair market value rental over the term of the lease. The appraisal contained no explanation of the manner in which Muller reached his conclusions other than the statements that he "examined * * * [materials related to the transaction] and conducted such investigations as we believe appropriate under the circumstances * * *"and he based his conclusions *694 upon "said investigations and our experience in the field of computer leasing and computer related equipment * * *." OPINION The issues are (1) whether petitioner's purchase of certain computer equipment should be respected for Federal income tax purposes; (2) whether petitioner's purchase and lease of the equipment was engaged in for profit within the meaning of section 183; (3) whether petitioner was at risk under section 465 with respect to his indebtedness; (4) whether petitioner used the appropriate method of depreciation; (5) whether petitioner's underpayment of tax is attributable to a valuation overstatement within the meaning of section 6659; and (6) whether the transaction was tax motivated within the meaning of section 6621(c) (formerly section 6621(d)). Petitioner beers the burden of proof on all issues. Rule 142(a). I. Whether purchase respected for Federal tax purposes
As we said in : Taxpayers are generally free to structure their business transactions as they please, though motivated by tax-reduction considerations. ; , *695 affd. on this issue . However, it is well settled that a transaction entered into solely for the purpose of tax reduction, and which is without economic, commercial, or legal purpose other than the expected tax benefits, is an economic sham without effect for Federal income tax purposes. , (1978); ; . Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. ; . In the sale and leaseback context, we set forth a standard that the non-user-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction, and that the transaction was supported by economic substance. . *696 [n12] In Rice's Toyota World, Inc., we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. . [n13] n12 . n13 The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. . This Court has had numerous opportunities to consider the validity for Federal income tax purposes of computer equipment sale-leasebacks. In each case, our conclusions regarding business purpose and economic substance were inherently factual. See . It is difficult to draw a precise line of demarcation between valid and invalid transactions. , affd. on this issue . *697 Petitioner bears the burden of proof, as respondent's determination is presumptively correct. Rule 142(a). We will separately consider whether petitioner has shown either that he was motivated by a business purpose or that the transaction had economic substance. A. Business purpose
The business purpose inquiry concerns petitioner's motive for entering the transaction. Rice's Toyota World, Inc. v. Commissioner, supra at 92. If petitioner had a business purpose other than obtaining tax benefits, he would not have committed himself to the transaction until he satisfied himself that there was a reasonable possibility that the residual value of the equipment would be great enough to offset his substantial investment in the equipment. Petitioner testified that he decided to purchase the equipment based on the figures on the spreadsheet and the advice and explanations being given him by Bergreen. He stated that he relied on the Diebold appraisal and expected to make a profit independent of tax benefits because of the $ 8,400 annual cash flow and the residual value. He did not consider getting a second appraisal because Diebold was well recognized and involved in the *698 German market. We conclude for several reasons that petitioner did not have a business purpose other than obtaining tax benefits. First, the only residual value figure that he saw prior to the transaction was the one on the spreadsheet. The 20-percent net residual value figure that appeared on the December 27 version of the spreadsheet apparently also appeared on the draft of the spreadsheet that petitioner saw in the first week of December 1980 because there were only minor variations from one spreadsheet to another. Mallin, the promoter, testified that he inserted the 20-percent figure into the spreadsheet after Equilease advised him that the Diebold appraisal was going to show such a residual value. Since petitioner first saw the spreadsheet in early December, this would mean that the Diebold appraisal would have had to be made by the first week of December. Muller testified, however, that he was not contacted to perform the Diebold appraisal until sometime in December 1980. We, accordingly, conclude that the residual value figure on the spreadsheet was not based upon an appraisal but instead was Mallin's estimate of residual value. We also note that the 20-percent figure *699 on the spreadsheet represented residual value after subtraction of the 10-percent marketing fee and expenses of sale, while Diebold's 20-percent figure represented residual value before subtraction of the marketing fee and expenses. This is further evidence that the spreadsheet figure was not based upon an appraisal but instead was Mallin's estimate. If petitioner had a business purpose, he would not have relied upon the promoter's estimate of residual value as he did. Second, petitioner asserts that his attorney, Bergreen, received an oral appraisal prior to the closing, but this assertion is not supported by the evidence. Bergreen admitted on cross-examination that the oral appraisal actually was received by an associate in his law firm. The associate then testified that he did not receive an oral appraisal from Diebold, but rather an oral confirmation from Equilease that an appraisal had been arranged and would be forthcoming. The associate also testified that he did not know whether Diebold had appraised the equipment when the closing took place on December 31, 1980. Accordingly, we conclude that neither petitioner nor any of his advisors had received a written or oral appraisal *700 prior to the time that petitioner committed himself to the transaction. Third, we attach little importance to the written appraisal petitioner received in January 1981. Petitioner asserts that he ensured that this appraisal would be forthcoming by withholding the letters of credit until after the appraisal was received. This argument has several flaws. First, it appears that Aardan's sale of the short-term notes to International Monetary Corporation had no effect upon Equilease, so we do not understand how petitioner could ensure Equilease's delivery of the appraisal by withholding the letters of credit from Aardan. Second, the parties stipulated that Aardan sold the notes to International Monetary Corporation on December 31, 1980. Any incentive that Aardan had to ensure delivery of the letters of credit would have terminated on that date. Third, petitioner asserts that his attorneys prepared "the legal documents * * * in meticulous detail," which suggests the documents covered all matters which petitioner thought were important. Since the documents did not provide petitioner with the right to receive an appraisal, we conclude that petitioner was not concerned with receiving *701 an appraisal. Fourth, we question whether petitioner's efforts to receive a written appraisal are even relevant to the issue of business purpose. If petitioner had a business purpose, he would have wanted to determine the profitability of the transaction before, rather than after, committing himself to the transaction. Once petitioner committed himself to the transaction, an appraisal would have been of little value unless the receipt of a satisfactory appraisal had been a condition of the transaction. It was not, so we conclude that his belated efforts to receive a written appraisal do not indicate a business purpose. Fifth, we note that the Diebold appraisal was long on conclusions, but short on reasoning. We have previously noted that "a listing of unsupported conclusions as to the Equipment's value" is "not a document worthy of reliance." . We question whether an experienced businessman with a business purpose would have made a $ 3-million purchase on the basis of such an appraisal, even when done by a reputable appraisal firm, especially when the appraisal was arranged by the seller. Finally, we address several *702 other arguments made by petitioner. First, he points to the thorough advice he received with respect to the transaction and the care with which he executed the various documents. Citing , he argues that such care is evidence of business purpose. No amount of such care, however, can establish a business purpose when there is little evidence that the transaction was motivated by nontax considerations. Second, petitioner asserts that he reasonably relied upon Equilease's representation that the appraisal would be satisfactory. However, the associate of Bergreen who handled the transaction admitted that he did not know whether Diebold had appraised the equipment before closing occurred. Thus, there was no basis on which to rely upon the representations of Equilease. Third, petitioner says that Equilease had been advised by its attorneys of possible securities law problems if the appraisal were not reasonable. The implication is that petitioner could be assured of a satisfactory appraisal since such an appraisal was in the interest of Equilease. However, the transaction was not conditioned upon the receipt of a satisfactory *703 appraisal, and except for some vague testimony by Mortimer Wimpie (Wimpie), who managed Equilease during 1980, there is no evidence that Equilease would have been willing to cancel the transaction if the appraisal had not been satisfactory to petitioner. Fourth, Bergreen and his associate testified that in December 1980, they retained a lawyer in Germany who "confirmed" both the Diebold appraisal and a residual value forecast by the managing director of Disko. We are unable to attach any weight to this sketchy testimony regarding the services of this lawyer. Petitioner's lack of interest in the residual value of the equipment is consistent with the nature of the transaction. The spreadsheet showed that petitioner would receive by the end of 1989 a $ 382,150 cumulative net benefit from the transaction at a 5-percent aftertax rate of return. This cumulative net benefit primarily resulted from the investment of up-front tax benefits and not from the transaction itself. Although the spreadsheet does not show this calculation, petitioner would have had a $ 142,150 cumulative net benefit at the end of 1989 even if the equipment had no residual value. Petitioner would have received *704 this benefit at no cost as each year's cumulative net benefits exceeded that year's investment or, in later years, net tax liability due to the transaction. Thus petitioner, due to tax benefits, had no investment in the transaction and his lack of interest in the residual value is understandable. If petitioner had really been looking to the transaction without tax benefits to return his cash outlays of $ 469,597, he would have been much more interested in residual values. The $ 8,400 per year of excess rent over principal and interest payments was a mere pittance that could not produce a business purpose in the mind of a reasonably astute businessman. Beyond the $ 8,400, in the years after 1982 the transaction was a wash that was probably handled by a series of bookkeeping entries. We conclude that petitioner was not motivated by a business purpose other than tax benefits. B. Economic substance
Petitioner's transaction "has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits." . We analyze *705 the transaction as a prudent investor would have. , affd. on this issue . We place some weight upon the taxpayer's subjective statement as to his nontax motive, but far greater emphasis upon objective facts demonstrating a realistic potential for profit. . The instant transaction was one in which petitioner made an investment of $ 469,597 and in return would receive $ 8,400 per year and the residual value of the equipment. Petitioner's net investment thus was $ 393,997 ($ 469,597 minus (9 X $ 8,400)). Since Equilease was entitled to retain 10 percent of the residual value, petitioner would earn a profit only if the residual value exceeded $ 437,774, or 14.6 percent of the original purchase price. Accordingly, petitioner must show that in 1980 a prudent investor could have concluded that there was a realistic opportunity that the residual value of the equipment at the end of the lease would have exceeded 14.6 percent of the original purchase price. Both parties rely on expert testimony to establish *706 the residual value of the equipment at the end of the lease. We are not bound by the opinions of such experts when their opinions are contrary to our own judgment. . In determining residual value, "the question is not who was correct in predicting the actual residual value of the computer equipment * * * [at the end of the lease]; rather, the question is what was reasonable to believe * * * [at the time of purchase] with respect to what the residual value of the computer equipment would be * * * [at the end of the lease]." . Petitioner presented two expert witnesses who testified that the residual value would be 20 percent or greater. Petitioner's first expert was Muller, the appraiser who did the original Diebold appraisal. Muller has been managing director at Diebold since 1986. Rather than preparing another appraisal, Muller explained his 1980 appraisal. He said that appraisal was based upon various information, including a "computer census of installations" which indicates the life of about 12,000 computer installations, price information collected *707 from leasing companies and brokers, information from market studies, and information from about 1500 other studies done each year. Muller did not, however, present any of this information in his expert report. Muller explained that his conclusion that the residual value would be 20 percent was based upon the assumption that -- price would be reduced to half about every four years. This assumption was based on experiences in the past. * * * Based on the fact that at the end of 1980 new products had been announced, a greater depreciation was assumed for the period 1980/1981. From 1981 through 1985 an almost straight line depreciation was assumed which would flatten out toward the end of the evaluation period. For such development it was assumed that even after the end of 1989 the respective equipment would have a scrap value (gold, copper wires, cables, boards) of about 10% to which a value of a further 10% considering its possible use had to be added. Taking all these factors and considerations into account, I arrived at the table of declining depreciation in value as attached to the Report. Muller concludes, as one might expect, that his 1980 appraisal was accurate *708 at the time it was issued. We find Muller's expert report to be confusing and difficult to follow. His testimony at trial did not clarify his report. In his original appraisal, Muller mentioned a useful (or economic) life of 11-1/2 years from the date of petitioner's purchase. However, in the expert report he presented at trial, he stated that at the "end of the seventies and the beginning of the eighties a useful life of ten years was assumed for economic feasibility studies." On the next page he states that the "life-cycle of the computer generation in the 60ies and 70ies made it possible that the usage of computer systems came up to 11 years and longer." Testifying at trial, he stated that at the time of the appraisal "we were using computers about 8 years, 10 years, 12 years or so." These various useful life figures not only differ from each other, but it is not entirely clear whether they are measured from the date of introduction, the date of original purchase, or the date of petitioner's purchase of the equipment. In any event, the useful lives of the equipment would not end more than a year or two beyond the termination of the 9-year leases. Any rentals received after *709 the termination of the leases and before the end of the useful lives would be low, in part because the equipment would be on the verge of obsolescence and would bring a low rental rate. In fact, we do not even know that the equipment could be rented as petitioner offered no evidence that Disko intended to, or did, lease the equipment to end users after the original user leases expired between mid-1982 and early 1985. This may mean that Disko believed that the equipment would be obsolete years before petitioner received the right to the residual value. We conclude that Muller's own assumptions regarding useful life result in a minimal residual value. We also question Muller's 10-percent figure for scrap value. Muller explained that he got this figure from the managers in charge of maintenance at the computer manufacturers. Muller now admits that actual scrap value "was considerably lower than the assumed 10% of the original value * * *." Muller explained that his estimate of scrap value was too high "because new technology brought electronic components and their implementation in compressed form." It is unclear, however, why "implementation in compressed form" would affect the *710 value of components such as gold, and why "implementation in compressed form" would not have been foreseen in 1980 by a computer expert who knew that computer components were becoming smaller. It appears to us that Muller simply received erroneous information regarding scrap value, and in 1980 the scrap value could not have been reasonably expected to be anywhere close to 10 percent. We note that S. Paul Blumenthal, one of respondent's experts, estimated scrap value to be less than 1 percent. We also do not understand how Muller can conclude that residual value equals the sum of a 10-percent scrap value and a 10-percent value from continued use. One cannot simultaneously scrap a piece of equipment and make further use of it. We conclude Muller's residual values are not based on sound and logical reasoning. We are left with the impression that in 1980 Muller was asked to provide an appraisal which would support the 20-percent residual value on Mallin's spreadsheet. He did so, and his expert report at trial was an attempt to justify that earlier appraisal. Petitioner's second expert was Barry T. Cross (Cross). Cross works for Computer Resale Brokers Limited (CRB), a United *711 Kingdom corporation which, according to its brochure, offers the "most comprehensive range of services including buying and selling computer equipment, brokerage and agency services for equipment disposal and acquisition." CRB does business in many countries, including Germany. Cross has worked for CRB since 1969, initially as international sales director and since 1973 as managing director (chief executive officer). His expert report states that as managing director he is "responsible for overseeing the business of CRB in general * * * and to ensure that the company projects an image of professionalism and trading integrity." Cross also says his "primary function as Managing Director of CRB is to stay current on market trends and market changes so that CRB can advise its major clients of the way it believes residual values of their computer equipment will change over the forthcoming years. These forecasts by CRB are used by our clients in their own forward planning of their major computer acquisitions." Cross testified that the equipment would have had "an average remaining useful life of approximately 12-1/2 years as of 31 December 1980." He says he would have estimated the *712 residual value to be 26 percent, or $ 780,000. We question Cross's appraisal for several reasons. First, Cross presents no substantiation for any of his figures. He claims to provide residual value forecasts to his firm's customers, yet there is no evidence that his appraisal was based upon any of the forecasts he made around the time of petitioner's purchase of the equipment. Nor, unlike Muller, does he present any theory which describes how computer prices decline over time. In addition, Cross apparently based his appraisal upon his perception of the effects of various developments in computer technology upon computer prices. We question, however, the weight that he attached to certain developments in technology. For example, he said that the announcement of the IBM 4300 series in 1979 had no effect upon the residual value of the IBM 370/158. However, in several cases we have noted that the announcement of the IBM 4300 series had a drastic effect on the fair market value and future residual value of mainframe computer systems such as the IBM 370/158. In , we said "the mainframe market was devastated following *713 the introduction of the 4300 Series in January 1979 * * *." See also , affd. without published opinion ; ; ; and . Cross also admitted on cross-examination that the IBM 308X computers competed with the 370/158. However, his report makes no reference to the IBM 308X computers. Petitioner explains that the IBM 4300 and 308X were too new to affect the European used computer market in 1980. However, their newness in 1980 does not mean that they would have no effect upon residual values 9 years later. We believe that the constant advances in the state of the art, including these computers, should have been given more attention by Cross. Had he done so, we believe he would have arrived at substantially lower residual values. We also question Cross's statement that he "would presently [in June 1988] estimate the residual value of the Equipment as of 31 December 1989 to be in excess of the US$ *714 600,000 estimate contained in [Muller's] Report." We do not understand anyone connected with this case, except Cross, to claim that the residual value at time of trial was anywhere near the $ 600,000 value in Muller's original appraisal letter. This casts further doubt upon Cross's ability to accurately forecast residual values. We conclude that Cross's conclusions regarding residual value are not credible. For example, he assumed a 12-1/2 remaining useful life for equipment that not only was used but had been introduced a number of years previously. In addition, he ignores the effect of the superior technology that was already on the market. If Cross had been less result-oriented, we believe his residual value figure would have been nominal. Before turning to the testimony of respondent's experts, we note that petitioner argues that a portion of his expected return from the investment would come from currency changes and inflation, and this would cause residual value to be greater than forecast in 1980. However, petitioner has presented no evidence that a reasonable investor in 1980 would have believed that the German Mark was more likely to increase than decrease in value. *715 With regard to a return from inflation, we note that Muller (and presumably Cross) calculated future residual values by reference to the past trend in residual values. Since inflation affected that past trend, the return from inflation was incorporated in the appraisals. Respondent's experts were S. Paul Blumenthal (Blumenthal) and Jonathan C. Moody (Moody), both employees of American Technology Appraisal Service. Blumenthal is senior vice president and has been involved in thousands of computer appraisals. Prior to this case, he had several times appraised computer equipment located in Europe. Moody is vice president and manages a staff which produces appraisal reports and market research reports on the pricing of computer equipment. Prior to this case, he had not been involved in the appraisal of computer equipment in Europe. Although Blumenthal and Moody have relatively little experience appraising European computer equipment, they are very familiar with the American computer market. Their report established American residual values by drawing upon appraisals done by their company in 1980. A March 1980 appraisal had forecast the IBM 370-158 would have minimal value by *716 1984, and virtually no value by 1985. This report discussed the effect of the IBM 4300 upon the residual price of the IBM 370. A September 1980 appraisal had forecast the IBM System/34 would have minimal value by 1985, and zero value by 1986. Blumenthal and Moody had no contemporaneous appraisal for the other equipment purchased by petitioner. However, the performance of the IBM 4300 was equal to or greater than that of the other equipment, and thus residual values of the 4300 would provide an accurate, or even optimistic, view of the residual value of the other equipment. A May 1980 appraisal of the IBM 4300 indicated that the 4300 would not have any residual value after 1988. Blumenthal and Moody had to adjust these American residual values for the differences between the American and European markets. Their report explained that the improvement of communications, and the expansion of computer use worldwide, had minimized differences between the European and American computer markets. A survey of the records of various international computer leasing firms and a review of various publications indicated that European new computer prices tended to be 150 percent of the American *717 price, while European used computer prices tended to be between 75 and 125 percent of American prices. Blumenthal and Moody explained that this difference between European and American prices was unlikely to widen because arbitragers would ship equipment between the two markets if the difference between American and European prices were greater than the costs of purchasing equipment in one market and selling in the other. In fact, Cross testified that American computer brokers were shipping used IBM 370's to Europe in 1980. Based upon their contemporaneous appraisals in the American market and taking into account the differences between European and American prices, Blumenthal and Moody concluded that none of petitioner's equipment would have any residual value in 1989. We were impressed with Blumenthal's expert testimony, and with the report that he and Moody prepared. Their discussion of the computer market during the relevant time period is complete and draws upon information in many respected computer publications. For example, the report mentions an August 1980 article in a European computer publication that comments upon "swift drops in residual values caused by rapid *718 technological progress * * *." Blumenthal and Moody also drew upon their contemporaneous appraisals done in 1980, and provided copies of their appraisals. This is unlike Muller and Cross, who provided little support for their residual values. We have studied all of the expert reports, listened to the experts on the witness stand and reviewed their testimony, and applied our own knowledge and experience. We conclude that respondent's position with respect to residual value is much more reasonable than petitioner's. Common sense tells us that Muller and Cross were too optimistic about the remaining useful lives of the equipment. They avoided any substantial consideration of the effect of the introduction of new equipment such as the IBM 4300 series, and the known rapid obsolescence in the field due to constant technological change. Muller focused on IBM 370 computer equipment, which was announced in the early seventies, with upgraded versions being announced in the following years. Such equipment was hardly state of the art when purchased by Disko in 1978. Petitioner did not purchase the equipment for another 2 years. We do not find it reasonable to conclude that such equipment *719 would have any measurable residual value 9 years after petitioner's purchase. We find the appraisals of respondent's experts to be sufficiently more convincing than those of petitioner's experts and conclude that in December 1980 a prudent investor would have concluded that the equipment would have only a nominal residual value in December 1989. . A final piece of evidence regarding residual value was furnished by Wimpie, the senior president and director of Equilease in 1980, and the individual who managed Equilease during the years in issue. Wimpie testified that Disko was surprised to be able to sell the equipment to Equilease. He said that Disko "derived whatever profits they planned to derive from those leases. The monies that Equilease paid was over and above what their anticipated income on the transactions were." This testimony suggests that Disko believed that the equipment had little or no residual value at the end of the end user leases. C. Conclusion
We conclude that a reasonable investor would not have believed that petitioner's transaction offered a reasonable opportunity *720 for economic profit exclusive of tax benefits. Accordingly, the transaction had no economic substance. Since petitioner also lacked a business purpose, the transaction will not be respected for Federal tax purposes. Petitioner's depreciation and interest deductions therefore are disallowed. Putting aside the business purpose and economic substance requirements and just focusing on the nature of the transaction, we believe it is clear that this transaction served no useful economic purpose. The original transaction between Dresdner Bank, Disko, and the end users was a completed transaction which served the economic and business purposes of all of the parties. Nothing more was needed. Equilease's purchase of the equipment and the subsequent sale to Aardan and petitioner had no effect upon the original transaction between Disko and the end users. In fact, there is no evidence that the end users even knew of the paper shuffling done by Equilease, Aardan, and petitioner. In essence, petitioner claims to have purchased a Christmas tree, but actually only purchased the right to hang some ornaments on a tree that was already in place and serving its full useful and economic purpose, *721 and to take possession of the tree after the Christmas holidays. II. Other Issues
Due to our disposition of the economic substance and business purpose issues, we need not reach the issues regarding section 183, section 465, and the appropriate method of depreciation. The only remaining issues for our consideration are whether petitioner's underpayment of tax is attributable to a valuation overstatement within the meaning of section 6659 and whether the transaction was tax motivated within the meaning of section 6621(c) (formerly section 6621(d)). There is a valuation overstatement for purposes of section 6659 if the adjusted basis of the equipment claimed by petitioner on any return was 150 percent or more of the correct adjusted basis. Section 6659(c). The correct adjusted basis was zero rather than the $ 3 million claimed by petitioner, so there was a valuation overstatement. The applicable percentage of the underpayment of tax attributable to that valuation overstatement shall be added to the tax. Sec. 6659(a). The applicable percentage is 30 percent. Sec. 6659(b). Accordingly, 30 percent of the underpayment attributable to the valuation overstatement shall *722 be added to petitioner's tax. Since there is a valuation overstatement under section 6659(c), the transaction was tax motivated within the meaning of section 6621(c)(3). Accordingly, petitioner is liable for the rate of interest established under section 6621(c)(1). Decision will be entered under Rule 155.
APPENDIX A COMPUTER EQUIPMENT -- FOR HOWARD GILMAN DEC 31 FISCAL 27-DEC-80 LEASED TO EQUILEASE (ALLIED CHEMICAL) FOR 108 MONTHS NON-ITC EQUIPMENT COST: $ 3,000,000 INDIVIDUAL TRANSACTION SUBLEASED TO DISKO (DRESDNER BANK) 12/31/80
1981
1982
1983
1984
RENT [1]
1,642 404,400 419,400 795,832 795,832 SALES PROCEEDS [2]
DEPREC. [3] USED:
(375,000)
(656,250)
(492,187)
(421,875)
(421,875)
INTEREST [4]
(1,641)
(591,000)
(591,000)
(571,954)
(524,681)
DEFERRED INT. 19%
(12,452)
(37,145)
TAXABLE
INCOME (LOSS)
(375,000)
(855,302)
(700,932)
(197,998)
(150,724)
RATIOS [5]
5.882 3.916 3.894 CASH FLOW [6]
EQUITY
(45,000)
NOTE PAYMENTS
(195,000)
(180,000)
DEFERRAL INT.
(12,452)
(37,145)
TAX BENEFITS 60%
225,000 513,182 420,560 118,799 90,435 SALES PROCEEDS
PREFERENCE TAX
(18,750)
(23,437)
CASH FLOW
AT 700/MO.
8,400 8,400 8,400 8,400 ANNUAL BENEFIT
161,250 290,691 211,815 127,199 98,835 CUM. BENEFIT
161,250 451,941 663,756 790,955 889,789 TOTAL CUMULATIVE
BENEFIT INCL. 5%
SINK. FUND [7][8]
161,250 474,538 720,671 890,263 1,038,552 *723 1985
1986
1987
1988
1989
RENT [1]
795,832 795,832 795,832 779,832 795,832 SALES PROCEEDS [2]
600,000 DEPREC. [3] USED:
(421,875)
(210,937)
INTEREST [4]
(467,035)
(396,743)
(311,030)
(206,512)
(79,063)
DEFERRED INT. 19%
TAXABLE
INCOME (LOSS)
(93,079)
188,150  484,801 589,319 1,316,768 RATIOS [5]
CASH FLOW [6]
EQUITY
NOTE PAYMENTS
DEFERRAL INT.
TAX BENEFITS 60%
55,847 (112,890)
(290,880)
(353,591)
(790,060)
SALES PROCEEDS
600,000 PREFERENCE TAX
CASH FLOW
AT 700/MO.
8,400 8,400 8,400 8,400 8,400 ANNUAL BENEFIT
64,247 (104,490)
(282,480)
(345,191)
(181,660)
CUM. BENEFIT
954,037 849,547 567,066 221,874 40,213 TOTAL CUMULATIVE
BENEFIT INCL. 5%
SINK. FUND [7][8]
1,157,940 1,106,122 864,823 545,613 382,150 *724  Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. ASSUMES CLOSING ON DEC. 31, 1980. RENT FOR STUB MONTH IS $ 1,641.67. RENT FOR MONTHS 1-12 is $ 33,700.00.) 13-24 IS $ 34,950.00) $ 66,319.32 FOR BALANCE OF LEASE. ↩
2. TAXPAYER RECEIVES ALL RESIDUAL PROCEEDS LESS 10% REMARKETING FEE TO EQUILEASE. ASSUMES 20% NET RESIDUAL VALUE. ↩
3. DEPRECIATION (NON-ITC EQUIPMENT) 6 YEAR LIFE 150% DB IN 1980-1982) STL IN 1983-1986. ↩
4. RECOURSE MORTGAGE IN FACE AMOUNT OF $ 2,955,000 BEARING INTEREST AT 20% PER ANNUM. NOTE PAYMENTS OF 0.00, $ 195,000.00, AND $ 180,000.00 ARE APPLIED TO THIS MORTGAGE. INTEREST ONLY THROUGH DEC. 1982. ↩
5. THE RATIO OF AGGREGATE WRITE-OFFS IN THIS TRANSACTION ($ 2,373,037) TO AGGREGATE INVESTMENT ($ 462,188) is 5.1411. ↩
6. TAXPAYER PAYS EQUILEASE $ 45,000 ON CLOSING. ON APR. 30, 1981 TAXPAYER PAYS EQUILEASE $ 195,000.00) ON JAN. 31, 1982 TAXPAYER PAYS EQUILEASE $ 160,000.00) FOR A TOTAL INVESTMENT OF $ 420,000 PLUS INTEREST ON THE DEFERRED PAYMENTS. ALL PAYMENTS ARE SECURED BY LETTER OF CREDIT. ↩
7. ASSUMES A 5% AFTER TAX RETURN ON "USE-OF-MONEY". ↩
8. INTERNAL RATE OF RETURN COMPUTED USING MULTIPLE INVESTMENT SINKING FUND METHOD. ASSUMING A SINKING FUND EARNINGS OF 5%. THE INTERNAL RATE OF RETURN EQUALS * * * [ILLEGIBLE].↩