**Howard GILMAN, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

**No. 921, Docket 90–4127.**

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1991.

Decided May 14, 1991.

R. Donald Turlington, New York City (James A. Gouwar, Bennett I. Deutsch, Stuart B. Katz, Brown & Wood, New York City, on the brief), for petitioner-appellant.

Jonathan S. Cohen, Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., Gary R. Allen, Nancy G. Morgan, Tax Div., Dept. of Justice, Washington, D.C., on the brief), for respondent-appellee.

Before NEWMAN and ALTIMARI, Circuit Judges, and CONBOY, District Judge.*

JON O. NEWMAN, Circuit Judge:

The principal issue on this appeal is whether a sale/leaseback transaction had sufficient economic substance to warrant income tax deductions for depreciation and interest. Howard Gilman appeals from the December 28, 1989, decision of the Tax Court (Charles E. Clapp II, Judge) upholding the disallowance of deductions and imposing a penalty tax and a penalty interest rate because of a valuation overstatement. We affirm.

## Facts

The taxpayer is the chief executive officer and chairman of Gilman Paper Company. In November 1980, Joel Mallin, a broker in equipment leasing deals, sought Gilman's individual participation in the sale and lease-back of some computer equipment that had already been purchased and leased to end-users. Between 1978 and 1980, Disko, a West German company engaged in leasing equipment to end-users in Europe, bought the computer equipment that is the subject of this case. The pur-

---

* The Honorable Kenneth Conboy of the District Court for the Southern District of New York, sitting by designation.

chase price of approximately $4.1 million was financed by loans from Disko's parent company, Dresdner Bank (of West Germany). Disko then leased the equipment to end-users in Europe.

With Gilman's agreed participation, the computer equipment transaction continued. Two additional companies became involved in the transaction, Equilease B.V. ("Equilease") and Aardan Leasing Corporation ("Aardan"). Equilease was a Netherlands corporation engaged in the sale, finance, and lease of computer equipment. Equilease had substantial United States activities and was unrelated to Disko. Aardan was a United States corporation unrelated to Disko or Equilease.

On December 30, 1980, Equilease purchased the computer equipment from Disko for $2,740,808, subject to the end-user leases and Dresdner Bank's security interest. Equilease leased the equipment back to Disko for a term of nine years. On December 31, 1980, Equilease sold the equipment to Aardan for $2,992,500, subject to Disko's lease, the end-user leases, and Dresdner Bank's security interest.[1] The same day, Aardan sold the equipment to the taxpayer, Gilman, for $3 million. Gilman then leased the equipment to Equilease for a term of nine years.

Gilman paid $45,000 in cash and signed an interest bearing note in the principal amount of $2,955,000. In form, almost $2 million of this long-term note was recourse, but it was secured by the equipment and its rental income. Gilman's monthly payments of $65,619.32 on the long-term note began in January 1983. Simultaneously, Gilman was scheduled to receive $66,319.32 monthly from Equilease on its lease. Therefore, the monthly rental income from the computer equipment covered, with some excess, the long-term note payments Gilman

was obligated to make under the equipment purchase agreement. Also, the long-term notes provided that Gilman could defer payment up to fourteen years if he failed to receive his corresponding lease payments from Equilease.

The interest that would accrue on the long-term note in 1981 and 1982 was paid in the form of two short-term recourse notes with a total face value of $375,000 plus interest on the short-term notes of $49,597. The notes were secured by letters of credit from Gilman's bank, Morgan Guaranty Trust Company. In summary, Gilman's total cash investment was $469,597, comprising his $45,000 down payment, the $375,000 face amount of the short-term notes, and the $49,597 interest on the short-term notes.

On his 1980 and 1981 tax returns, Gilman reported this computer transaction as a $3 million purchase, took deductions for depreciation and interest, and included as income the rent received from Equilease. The Commissioner disallowed these tax deductions, excluded the rental income, and issued Gilman a notice of deficiency for the tax years 1980 and 1981 in the amounts of $171,680 and $329,555, respectively. The Commissioner classified the 1981 underpayment as due to a valuation overstatement and assessed a section 6659 penalty tax of $98,867.[2] In addition, the Commissioner viewed both years' underpayments as the result of a tax-motivated transaction and applied the section 6621(c) penalty rate of interest.[3] Gilman filed a petition with the Tax Court.

The Tax Court identified six issues: (1) should the transaction be respected for federal income tax purposes, (2) was this transaction "for profit" within the meaning of 26 U.S.C. § 183 (1969), (3) was Gilman

---

**1.** According to Mallin's testimony, Aardan was inserted into the transaction as a "middle company" in an effort to comply with the "at risk" provisions of 26 U.S.C. § 465 (1976). Aardan was incorporated on December 29, 1980, two days before it purchased the computer equipment.

**2.** The section 6659 penalty tax was not assessed against the 1980 tax return because the provi-

sion became effective only for returns filed after December 31, 1981.

**3.** The subsection was redesignated from (d) to (c) by section 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat. 2744. The provision will be cited hereafter as section 6621(c).

"at risk," as defined in section 465, with respect to his indebtedness, (4) was the appropriate method of depreciation used, (5) was any underpayment of tax attributable to a valuation overstatement as defined in section 6659, and (6) was the transaction tax-motivated as defined in section 6621(c).

In considering whether the transaction should be respected for federal income tax purposes, the Court noted that in the context of sale/leaseback transactions, the non-user owner must establish that

> "the entry into the transaction was motivated by business purpose to justify the form of the transaction, and that the transaction was supported by economic substance. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. [184] at 201–203 [(1983)]. In *Rice's Toyota World, Inc.*, we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. at 196."

*Gilman v. Commissioner*, 58 T.C.M. (CCH) 1075, 1078 (1989) (quoting *Larsen v. Commissioner*, 89 T.C. 1229, 1251–52 (1987), *aff'd in relevant part, rev'd in part sub nom. Casebeer v. Commissioner*, 909 F.2d 1360 (9th Cir.1990)). The Tax Court further stated that "[t]he presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest." *Id.* (quoting *Larsen*, 89 T.C. at 1252 (1987)).

Applying this standard, the Court first concluded that if Gilman had had a business purpose other than tax benefits, "he would not have committed himself to the transaction until he satisfied himself that there was a reasonable possibility that the residual value of the equipment would be great enough to offset his substantial investment in the equipment." *Id.* Gilman claimed that he relied on the residual value figure provided by Diebold Deutschland BmbH ("Diebold"), a West German computer company hired by Equilease to appraise the equipment. Gilman also contended that it was unnecessary to obtain a second appraisal because Diebold was well recognized in the German market.

However, the Tax Court found that the only residual value figure that Gilman saw prior to the transaction was the one provided by Mallin indicating a 20 percent net residual value. The Court rejected Mallin's assertion that the figure was a quote he had received from Diebold through Equilease. The only oral appraisal received prior to closing was received not by Gilman's attorney as alleged but by an associate in his attorney's firm. And it was not an appraisal from Diebold but rather a confirmation from Equilease of what Diebold's forthcoming appraisal would conclude. The Diebold appraisal that arrived in January 1981 provided Gilman no protection because the sale/leaseback transaction was not conditioned on receipt of a satisfactory appraisal.

Gilman's lack of interest in the residual value of the equipment was a key factor in the Tax Court's analysis of the transaction. Even if the equipment had no residual value, Gilman would have received a cumulative net benefit of $142,150 at the end of 1989, primarily through the investment of up-front tax benefits. With his cash investment of $469,597, Gilman would have been much more interested in the residual value of the equipment if his motivation had been business and not tax benefits. The Court concluded that "[t]he $8,400 per year of excess rent over principal and interest payments was a mere pittance that could not produce a business purpose in the mind of a reasonably astute businessman." *Id.* at 1080.

In determining whether the sale/leaseback transaction was a sham, the Court also considered whether the transaction had economic substance, noting that a transaction " 'has economic substance and will be recognized for tax purposes if the transaction offers a reasonable opportunity for economic profit, that is, profit exclusive of tax benefits.' " *Id.* (quoting *Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986)). The Court approached the analysis from

the standpoint of the prudent investor. *See Rice's Toyota World, Inc. v. Commissioner,* 81 T.C. 184, 209 (1983), *aff'd in part, rev'd in part,* 752 F.2d 89 (4th Cir. 1985) (affirming the finding that transaction was a sham and the disallowance of depreciation and interest deductions on nonrecourse debt). The Court, however, gave some consideration to the taxpayer's subjective statement as to his non-tax motive. *See Cherin v. Commissioner,* 89 T.C. 986, 992 (1987).

Gilman would earn a non-tax based profit on this transaction only if the residual value exceeded $437,774, or 14.6 percent of the original purchase price.[4] Therefore, Gilman was required to demonstrate that "a prudent investor could have concluded that there was a realistic opportunity that the residual value of the equipment at the end of the lease would have exceeded 14.6 percent of the original purchase price." *Gilman,* 58 T.C.M. at 1080. Gilman and the Commissioner presented experts to testify as to what were reasonable expectations, at the time of the transaction, of the residual value. Because Gilman's experts presented contradictory, incomplete, and unsupported conclusions regarding useful life, scrap value, price decline, and the effect of innovation and development in the computer industry, the Court found "the appraisals of [the Commissioner's] experts to be sufficiently more convincing than those of [Gilman's] experts and conclude[d] that in December 1980 a prudent investor would have concluded that the equipment would have only a nominal residual value in December 1989." *Id.* at 1083.

Since the taxpayer lacked a business purpose and his transaction lacked economic substance, the Tax Court deemed the sale/leaseback transaction a sham, not to be respected for federal tax purposes. The Court disallowed the deductions, and found Gilman liable under the penalty provisions of sections 6659 and 6621(c). The taxpayer filed a motion asking the Tax Court to vacate or revise its decision and permit the taxpayer to deduct the $12,452 of interest

paid in 1981 on the short-term notes. Since the Commissioner conceded that the taxpayer was entitled to this deduction, the Tax Court vacated its original decision and entered a new decision under Rule 155 of the Tax Court Rules of Practice and Procedure. *Gilman v. Commissioner,* 59 T.C.M. (CCH) 465 (1990). Thus, Gilman was assessed deficiencies of $171,680 for 1980, and of $320,135 for 1981, along with a section 6659 penalty tax of $96,040.50 for 1981. The penalty interest rate under section 6621 was applied to the underpayments for both tax years. Gilman appealed.

### Discussion

I. Was the sale/leaseback a sham transaction?

■ On appeal, the taxpayer first argues that the Tax Court applied the wrong legal standard in determining whether his transaction was a sham. Gilman claims that the Court erred in applying the two-pronged legal standard of *Rice's Toyota* (business purpose and economic substance). Relying on our recent decision in *Jacobson v. Commissioner,* 915 F.2d 832 (2d Cir.1990), Gilman contends that the relevant standard for determining economic substance is "whether the transaction may cause any change in the economic positions of the parties (other than tax savings)," and "that the 'profit motive/business purpose' inquiry should be based on the criteria in the regulations under section 183." Brief for Appellant at 15.

Gilman's argument is premised on an incorrect reading of *Jacobson.* In that case we rejected the Tax Court's finding that a film transaction was a sham, where the Tax Court had relied on its subjective opinion of the film. However, we explicitly supported the business purpose/economic effect analysis of sham transactions: " 'A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deduc-

---

**4.** This calculation is based on Gilman's net investment of $393,997 (the $469,597 cash investment minus the income of $8,400 per year for nine years from Equilease) and the fact that Equilease was entitled to retain 10 percent of the residual value of the equipment.

tions.'" *Jacobson*, 915 F.2d at 837 (quoting *DeMartino v. Commissioner*, 862 F.2d 400, 406 (2d Cir.1988)). We also noted that a court could either inquire whether there were any non-tax economic effects or use the analysis under section 183. *Id.* at 837–38. Whether the terminology used was that of "economic substance, sham, or section 183 profit motivation" was not critical; what was important was reliance on objective factors in making the analysis. *Id.* at 838.

The taxpayer also misunderstands the *Rice's Toyota* two-pronged test and its application in the present case. In *Rice's Toyota*, the Court was assessing the validity of a sale/leaseback transaction. The Court stated that the "sham transaction theory" "requires that business transactions meet a minimum threshold of a business purpose or economic objective." *Rice's Toyota*, 81 T.C. at 209. Having failed to find business purpose, the Court in *Rice's Toyota* then "examine[d] the transaction for economic substance, an objective test. [This required that the Court] analyze the transaction as a prudent businessman would to ascertain whether it had any economic substance apart from its beneficial tax consequences." *Id.*

In the present case, the Tax Court did not demand that the taxpayer demonstrate both business purpose and economic substance. Rather, the Court examined each prong separately and concluded that Gilman lacked a business purpose and that the transaction lacked economic substance. The Tax Court applied the sham analysis consistent with the guidelines of this Circuit and others, indicating the flexible nature of the analysis. *See Jacobson*, 915 F.2d at 837–38; *Casebeer v. Commission-*

er, 909 F.2d 1360, 1363 (9th Cir.1990); *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.), *cert. denied*, 488 U.S. 824, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *see also Zmuda v. Commissioner*, 731 F.2d 1417, 1420 (9th Cir.1984).

The taxpayer relies on *Rosenfeld v. Commissioner*, 706 F.2d 1277 (2d Cir. 1983), and *Commissioner v. Brown*, 380 U.S. 563, 85 S.Ct. 1162, 14 L.Ed.2d 75 (1965), to argue that where a transaction changes the beneficial and economic rights of the parties it cannot be a sham. But the Commissioner does not contend that Gilman does not own the computer equipment. Instead, the concern is that his entry into the transaction was motivated by tax consequences and not by business or economic concerns.[5]

Gilman's second argument is that even if the Tax Court applied the proper legal standard, his transaction was not a sham under the *Rice's Toyota* two-pronged test. To demonstrate that he had a business purpose, Gilman refers to the spreadsheet that he and his advisors reviewed, the businesslike manner in which he conducted the transaction, and his own ability to evaluate the transaction based on personal business experience. Gilman objects to the reasoning of the Tax Court that he should have obtained an oral or written appraisal before committing himself and should have sought a second appraisal. However, Gilman fails to show that the Tax Court was clearly erroneous in concluding that the evidence regarding his minimal efforts to determine the residual value and secure a reasonable estimate prior to entering the transaction were inconsistent with a business purpose, particularly in light of the surrounding circumstances of the transaction.

---

5. The taxpayer argues that the Tax Court erred in requiring a reasonable possibility of profit because the regulation under section 183 states that "a reasonable expectation of profit is not required." Treas.Reg. § 1.183–2(a) (1972). However, Gilman's assertion of error is incorrect on two grounds. First, even according to Gilman's own analysis, section 183 applies after a transaction has been determined to have economic substance. The Tax Court concluded that Gilman's transaction lacked economic substance. Second, both the regulation and *Jacob-*

son refer to the expectation of profit in the context of risky business ventures, typified by the wildcat oil well, not the residual value in equipment at the end of a nine-year lease. *See also Bryant v. Commissioner*, 928 F.2d 745 (6th Cir.1991) (risky nature of gold mine venture does not render it a sham). Additionally, the Tax Court in the present case made reference to the expectation of profit in an effort to identify the kind of information a businessman would seek before entering into this transaction.

The Court's conclusion that Gilman lacked a business ·purpose was not based on the view that Gilman had poor advisors. Instead, it reflected the fact that the tax benefits were the motivation: once the documentation established those benefits, Gilman was unconcerned about residual value. Even if the residual value was zero, the tax benefits made the arrangement attractive to Gilman.

With respect to economic substance, Gilman argues that the combination of a fair purchase price, fair rent received, guaranteed cash flow, residual value, and trusted advisors all indicate the substance of the transaction. However, the most important element for economic substance in this transaction was the residual value. As the Tax Court noted, the residual value had to be greater than 14.6% of the original value for Gilman to recoup his investment. Gilman claims that there can be more than one reasonable estimate in 1980 of the residual value of the equipment in 1989. This statement is correct, and the Tax Court recognized that its inquiry was limited to what was reasonable to believe in 1980, not which expert was correct in 1990. As noted earlier, the Court found Gilman's experts' testimony vague, unsupported, contradictory, and incomplete. The Court was entitled to conclude that their estimates of residual value were "not based on sound and logical reasoning" and were "not credible." *Gilman*, 58 T.C.M. at 1081–82.

In contrast, the Court viewed the testimony of the Commissioner's experts as supported by and drawing upon data, publications, and appraisals existing at the time of this transaction. The reports of the Commissioner's experts took into consideration the impact of technological development and innovation on the residual value of the computer equipment. While the Court observed at the outset that it was not bound by the opinions of any of the experts, it concluded in the end that the Commissioner's experts provided a realistic picture of what the reasonable investor

would have believed in 1980, and that it was not "reasonable to conclude that such equipment would have any measurable residual value 9 years after [Gilman's] purchase." *Id.* at 1083.

The taxpayer has failed to demonstrate that the Tax Court's finding that the sale/leaseback transaction was a sham was clearly erroneous.

## II.   Application of the penalty tax

■   The Tax Court imposed an overvaluation penalty based on Gilman's 1981 tax return. Pursuant to section 6659, a penalty is imposed where there is an underpayment of tax "attributable to a valuation overstatement" of property on the tax return. The amount of the penalty is a percentage of the underpayment; the applicable percentage is based on the degree of overvaluation. Under the tax laws in effect during the relevant period, a 30 percent penalty was assessed where the property was valued on the return at more than 250 percent of its correct value or adjusted basis. Section 6659(b).

The Tax Court calculated a deficiency of $329,555 on the 1981 return, based on the disallowance of the deductions for depreciation and interest and the exclusion of rental income.[6] Then the Court concluded that the correct adjusted basis of the computer equipment was zero, and not the $3 million claimed by the taxpayer. With the basis at zero, the percent of overvaluation was infinite; the Court therefore applied the maximum penalty percentage rate, 30 percent, since the property was overvalued by more than 250 percent. Section 6659(b). A penalty of $98,867 (30 percent of the underpayment attributable to the overvaluation, *i.e.*, $329,555) was added to Gilman's 1981 taxes.

Gilman challenges the overvaluation penalty on two grounds. First, he contends that section 6659(b) is totally inapplicable because there was no "valuation overstatement" within the meaning of the penalty

---

6.   This figure is from the Tax Court's original opinion, prior to the adjustment for the deduction of interest paid on the short-term notes.

The difference is not relevant to the arguments regarding application of section 6659.

provision. The Commissioner, says Gilman, did not contend that Gilman claimed too high a basis; instead, the claim was that the sale transaction was a sham and that Gilman had no basis at all. Second, Gilman contends that if there was an overstatement, the deficiency was not attributable to it, as required by section 6659(b). We think the Tax Court properly rejected both contentions.

The application of section 6659(b) to a transaction determined to be without economic substance is not self-evident. The statute is most appropriately applied to instances where a taxpayer claims for an asset a value that the Commissioner determines is unduly high. The paradigmatic case is the inflated value claimed for a work of art in order to obtain a large deduction for a charitable donation. That is the example provided in the legislative history when the specific penalty for overvaluation was first adopted in 1981. *See* Joint Committee on Taxation, *General Explanation of the Economic Recovery Act of 1981*, 97th Cong., 1st Sess. 334, *reprinted in Internal Revenue Acts 1980–1981* 1704 (1981).

Application of the overvaluation penalty in the context of tax shelter transactions challenged as lacking economic substance appears to have developed from a series of cases involving cattle breeding. The sequence begins with *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981). The taxpayer used a small amount of cash and substantial nonrecourse loans ostensibly to acquire interests in cattle. The Commissioner primarily contended that in reality no sale had occurred and that all depreciation deductions should be disallowed. Alternatively, he argued that only limited depreciation deductions should be allowed based on a fair market value far below the taxpayer's alleged purchase price. The Tax Court ruled that the claimed sale price far exceeded fair market value, that a sale had not occurred, and that the transaction lacked economic substance. Depreciation deductions were disallowed entirely.

On similar facts in *Zirker v. Commissioner*, 87 T.C. 970 (1986), similar conclusions were reached. In *Zirker*, however, the Court cited *Grodt & McKay Realty* for the proposition that since no sale had occurred, "it follows that petitioner's 'correct' adjusted basis in the cattle is zero." 87 T.C. at 978. The Court then concluded that an overvaluation penalty would be imposed under section 6659 and fixed the penalty percentage at 30 percent, viewing the overvaluation as having exceeded 250 percent. *Zirker* was relied on by the Eighth Circuit to impose an overvaluation penalty in still another case involving a claimed purchase of breeding cattle, *Massengill v. Commissioner*, 876 F.2d 616 (8th Cir.1989).

It is fairly questionable whether what occurred in these cases was a "valuation overstatement." What indisputably happened is that the Tax Court ruled that no sale had occurred. In one sense, the taxpayers had "overvalued" by claiming a high value for an asset that the Tax Court ruled they had not bought at all. Yet, in another sense, these were not cases of taxpayers selecting an unduly high value; rather, the taxpayers were rebuffed in their claims that any purchase at all had occurred. To say that a taxpayer has a zero basis in an asset he is found not to have acquired seems strained. Yet the appropriateness of the penalty seems more justified if one considers the alternative arguments of the Commissioner in *Grodt & McKay Realty*, arguments typically made in tax shelter disputes. Had the Commissioner been confined to his fallback position that the taxpayer's basis for depreciation was fair market value, a value far below his claimed purchase price, it would have been entirely sound to say that the asset had been "overvalued" and to impose the section 6659 penalty. If the Commissioner is more successful and persuades the Court to disregard not only the nonrecourse notes but the entirety of the purchase price, thereby lowering the "price" down not only to fair market value but all the way to zero, should the Commissioner's success have the perverse effect of sparing the taxpayer the overvaluation penalty?

We are inclined to accept the view of the Tax Court in this and the prior cases and of the Eighth Circuit in *Massengill* and deem the penalty applicable. Indeed, ours is a stronger case for the penalty than the cattle cases, because, while the Commissioner disputes that the computer transaction has sufficient economic substance to warrant deductions for depreciation and interest, he does not contend that Gilman did not make a purchase. We acknowledge that applying the penalty somewhat strains the natural reading of the statutory phrase "valuation overstatement." And where the taxpayer's basis has been reduced to zero, it is somewhat odd to apply a provision that scales the penalty rates to the percentage of overvaluation. The percent of "overvaluation" above zero is infinite, which is literally more than 250 percent, the level at which the 30 percent penalty rate begins to apply. But arguably the overvaluation in a sham transaction is different in kind, not merely degree. On the other hand, application of the section 6659 penalty surely reenforces the Congressional objective of lessening tax shelter abuse. Moreover, we note that when Congress recodified and somewhat simplified penalty provisions in 1989 by creating a general "accuracy-related penalty," Pub.L. 101–239, § 7721(a), 103 Stat. 2395, 2395–97 (1989), to be codified at 26 U.S.C. § 6662, *see* 26 U.S.C.A. § 6662 (Supp.1991), it retained the concept of a "valuation overstatement" as an example of a circumstance warranting the revised penalty, *see* subsections 6662(b)(3), (e), and made no change to preclude application of the penalty to tax shelter transactions like Gilman's where an alleged purchase price is totally disregarded as a basis for depreciation deductions.

■ Gilman further argues that even if there was a valuation overstatement, the tax deficiency was not "attributable" to it, as required by section 6659(a). Gilman relies primarily on *Todd v. Commissioner*, 862 F.2d 540 (5th Cir.1988), in which the taxpayers took depreciation deductions on property with a highly inflated basis. They failed, however, to put the property into service in the tax year for which they were claiming the deductions. The deductions were denied, creating an underpayment of tax. The Court concluded that there should be no section 6659 penalty because the underpayment was not attributable to the valuation overstatement, but rather to the taxpayer's failure to comply with the depreciation regulations requiring the property to be placed into service. *See also Heasley v. Commissioner*, 902 F.2d 380 (5th Cir.1990) (imposition of section 6659 penalty reversed, based on *Todd*). Applying this interpretation of section 6659 to his case, Gilman argues that where the underpayment derives from the disallowance of the transaction (*i.e.*, non-recognition of the transaction for tax purposes), then the underpayment is not attributable to an overvaluation.

Again, we agree with the Tax Court and with the Eighth Circuit, which has concluded that "[w]hen an underpayment stems from disallowed depreciation deductions or investment credit[s] due to lack of economic substance, the deficiency is attributable to overstatement of value, and subject to the penalty under section 6659." *Massengill*, 876 F.2d at 619–20. The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement. While the Tax Court did not explicitly discuss the question of whether the purchase price paid by Gilman was fair, a premise of the Court's conclusion is that at the time Gilman entered the transaction, he could not reasonably expect a profit independent of taxes and that the purchase price of $3 million was more than the computers were worth. In that way, the overvaluation of the computer equipment contributed to the Court's conclusion that the transaction lacked economic substance and was a sham.

Perhaps recognizing that he was not likely to succeed on his broad argument that underpayments arising out of transactions disallowed for lack of economic substance are not attributable to valuation overstatements, Gilman suggests a more refined approach. He urges us to evaluate the relationship between each disallowed tax item and the overvaluation and determine whether the specific disallowed item relied

on the overvaluation. We need not do so. Gilman's various disallowed tax items, for example his depreciation and interest deductions, were all disallowed because the transaction was a sham. Where a transaction is not respected for lack of economic substance, the resulting underpayment is attributable to the implicit overvaluation. A transaction that lacks economic substance generally reflects an arrangement in which the basis of the property was misvalued in the context of the transaction. While this interpretation of underpayment "attributable to a valuation overstatement" represents a less common application of section 6659, we believe it comprehends the tax return representations that Congress intended to penalize.

III. Imposition of a penalty rate of interest

Under section 6621(c)(1) interest on tax deficiencies is levied at a rate of 120 percent of the normal rate where the underpayment is attributable to a "tax motivated transaction." Tax-motivated transactions include valuation overstatements. Section 6621(c)(3)(A). Since Gilman's computer equipment transaction involved a valuation overstatement, the penalty interest rate of section 6621(c) applies.

### Conclusion

For the foregoing reasons, the decision of the Tax Court is affirmed.