T.C. Memo. 1999-130


UNITED STATES TAX COURT


LOWELL L. AND MARILYN A. ROBERTSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent<sup>*</sup>


Docket No. 15586-88.                    Filed April 20, 1999.


<u>Albert H. Turkus</u> and <u>Frederick T. Goldberg</u>, for
petitioners.

<u>Michael D. Wilder</u> and <u>Paulette Segal</u>, for
respondent.


SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

WHALEN, <u>Judge</u>:  This case is before the Court to
reconsider that part of our opinion in <u>Robertson v.</u>

———————————————

    *This opinion supplements our opinion in <u>Robertson v.</u>
<u>Commissioner</u>, T.C. Memo. 1994-424.

<u>Commissioner</u>, filed at T.C. Memo. 1994-424 (hereinafter Robertson I), holding petitioners liable for additions to tax under sections 6653(a)(1) and (2) and 6661.  All section references are to the Internal Revenue Code, as amended and in effect during the years in issue.  It is also before the Court to resolve the dispute between the parties over the correct amount of the deficiencies to be entered in accordance with the findings and conclusions of the Court in Robertson I, pursuant to the procedure specified in Rule 155 of the Tax Court Rules of Practice and Procedure.  In this opinion, all Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise stated.

Robertson I dealt with petitioners' income tax return for 1984 in which they claimed a loss from a sale-leaseback transaction, involving computer equipment, that had been entered into by the Roscrea Trust (hereinafter sometimes referred to as the Trust) of which Lowell L. Robertson (petitioner) was a unitholder.  We held that the trans-action was a sham because it lacked economic substance and was not entered into with a business purpose.  Accordingly, we sustained respondent's disallowance of the loss.  We also sustained respondent's determination of petitioners' liability for additions to tax under sections 6653(a)(1)

and (2) and 6661 and for increased interest under section 6621(c).

Following the release of Robertson I, the Court and counsel for the parties in 47 other cases that were filed by the other unitholders of the Roscrea Trust and by petitioners for the years 1982, 1983, and 1985 agreed that petitioners and the other unitholders of the Trust were bound by Robertson I as to the losses claimed from the Trust, a determination made at the entity level, but that the other unitholders were not bound by Robertson I as to a unitholder's liability for the additions to tax under sections 6653 and 6661, a determination made at the unit-holder level. See Merino v. Commissioner, T.C. Memo. 1997-385; Webb v. Commissioner, T.C. Memo. 1990-556, remanded without published opinion 17 F.3d 398 (9th Cir. 1994). The other unitholders advised the Court that they wished to present evidence on the issue of their liability for the additions to tax under sections 6653 and 6661 but represented that such evidence would not be taxpayer specific. After discussions, the parties in each of the related cases agreed to be bound by the result in the instant case, and the Court reopened the record and set it for further trial to permit petitioners to introduce

additional evidence concerning petitioners' liability for the additions to tax that were determined by respondent.

In connection with that further trial, petitioners submitted to the Court and served on respondent the "expert" witness reports of Mr. Paul M. Raynault, founder and chairman of Computer Leasing, Inc., a firm specializing in computer lease financing and management, and Professor George Mundstock, a professor of law at the University of Miami.  In response, respondent filed a motion in limine asking the Court to exclude that "expert" testimony on the ground that it is neither relevant nor helpful to the trier of fact.  At the further trial, the Court took respondent's motion in limine under advisement and permitted both experts to testify subject thereto. Petitioners presented no other testimony or evidence.

FINDINGS OF FACT

The facts are set forth in Robertson I and are incorporated herein by reference.  We restate only those facts necessary to address petitioners' position that "the Court should vacate those portions of its decision [sic] relating to additions to tax and hold that Petitioner is not liable for any such additions pursuant to Sections 6653(a) and 6661."

Petitioner is a unitholder of the Roscrea Trust that was formed by 24 partners and principals of a major national accounting firm specifically to facilitate their participation in the subject sale-leaseback transaction. Pursuant to a Purchase, Sale and Assignment Agreement dated December 28, 1982 (Sale Agreement), the Trust purchased an interest in certain computer equipment from Systems Leasing, Inc. (Systems).  The Sale Agreement describes the equipment as Domestic Equipment and Foreign Equipment.  The Domestic Equipment consisted of equipment manufactured by IBM and leased to Burroughs Wellcome Co., the initial user, for a 60-month term beginning on or about June 1, 1982, and equipment manufactured by Control Data Corp. and leased to First Computer Corp., the initial user, for a 37-month term beginning on or about August 31, 1982.  The Foreign Equipment was manufactured by IBM and was leased to DuPont de Nemours (Deutschland) GmbH, the initial user, part of it for a 48-month term beginning on or about November 1, 1982, and part of it for a 36-month term beginning on or about the same date.

At the time the Trust entered into the Sale Agreement, the equipment was subject to two master leases, one covering the Domestic Equipment between Systems and Equilease Associates I Limited Partnership, and one covering the

Foreign Equipment between Systems and Equilease C.V.  We shall refer to all Equilease entities as Equilease.  Under each master lease, Systems, as lessor, leased the equipment to Equilease, as lessee, and assigned to Equilease all of the lessor's rights under the initial user leases.  The term of both master leases was 96 months.  In return, Equilease agreed to pay fixed rent, contingent rent, and taxes.  Generally, fixed rent refers to the rent to be paid by Equilease.  The amount of the fixed rent was equal to the payments the Trust was required to make under the Trust Note, as further discussed below.  Contingent rent refers to the rent that might be received from re-leasing the equipment between expiration of the initial user leases and the end of the master leases.  Under the terms of the master leases, the Trust and Equilease shared any contingent rent.

Under the Sale Agreement, the Trust purchased an interest in the subject computer equipment and received assignment of Systems' interest in the master leases. The stated purchase price was $5,170,392.  The Trust paid Systems $954,000 in cash, of which $917,392 was characterized as a downpayment and $36,608 was characterized as a prepayment of interest due on the Trust Note in 1983.  The Trust issued a promissory note

to Systems in the principal amount of $4,253,000 (Trust Note) that bore interest at the rate of 16¾ percent per annum compounded quarterly and was secured by a security interest in favor of seller in the rents from the master leases and the equipment.  The Trust Note required payment of interest only for each of the first 4 quarters, in arrears in the amount of $168,942.50 per quarter, and payment in the amount of $260,781.95 for each of the remaining 28 quarters.

As mentioned above, each payment due from the Trust under the Trust Note was exactly offset by the aggregate quarterly payments of fixed rent that the Trust was entitled to receive from Equilease under the master leases. The Investment Memorandum states as follows:

> The term of each [Master] Lease coincides with the term of the Trust Note.  Payment of fixed rent under each Lease will be due quarterly in arrears commencing with the end of the first quarter following the Closing and thereafter on the last day of the calendar quarter to which each such payment relates, and, if paid, all such payments will be sufficient to pay the quarterly installments under the Trust Note as and when due.  Any distributable cash flow to the Trust will be dependent on the re-leasing of the Equipment after the expiration of the initial term of the User Leases, although the fixed rent payments during that time, if paid, will be sufficient to pay all installments on the Trust Note as and when due.

The Investment Memorandum further states as follows:

> If [fixed] rent is timely paid by each Lessee over the eight years of the [Master] Leases, the Trustee will receive, in the aggregate, minimum payments, in arrears, of $168,942.50 ($1,689.42 per unit) per quarter for the first four quarters and $260,781.95 ($2,607.82 per unit) per quarter for the remaining twenty-eight quarters. The Trustee will be required to apply all of such minimum receipts to interest payments and debt amortization under the Trust Note.

The Declaration of Trust provided that the Trust would terminate shortly after the expiration of the master leases. While it was possible for the unitholders to agree to establish a new trust and re-lease the computer equipment, it was anticipated that the equipment would be sold after expiration of the master leases. The Investment Memorandum states as follows:

> At the expiration of the Leases, all of the Unitholders may direct the Trustee to remarket the Equipment on their behalf. If the Equipment is re-leased and not sold, the Unitholders, as co-owners of the Equipment, must provide for the payment to each owner of his share of the rent and may elect to establish a new trust. The Declaration of Trust provides that the Trust will terminate for all purposes 8 years and 3 months after its creation, unless it has been terminated at an earlier date, for example, following a sale of the Equipment. (See "Acquisition and Lease Terms--Marketing arrangements".) In the absence of unanimity among the Unitholders as to any proposed remarketing of the Equipment, the Declaration of Trust provides that the Equipment will be sold at auction and the net proceeds of

such sale will be distributed to the owners in accordance with their respective ownership interests in the Equipment. (See "Risk Factors --Termination of the Trust.")

In view of the fact that the quarterly payments of fixed rent equaled the quarterly installments under the Trust Note, any economic benefit to the unitholders from this transaction could arise from only two sources: Contingent Rents and the proceeds from the sale of the equipment after expiration of the 96-month master leases. The Investment Memorandum states as follows:

> Economic benefits to the Unitholders during the term of the Leases will arise out of rents payable under the Leases by Lessees, which rent will consist of both fixed rent and certain "Additional Rents" [i.e., contingent rents] based on a percentage of revenues, if any from the re-leasing of the Domestic Equipment by Domestic Lessee and the re-leasing of the Foreign Equipment by Foreign Lessee following the expiration of the initial term of the Domestic User Leases and the Foreign User Lease (the "User Leases"). Fixed rents payable under the Leases together with the investor's cash contributions to the Trust will be sufficient to service the installment obligations under the Trust Note.

> \* \* \* \* \* \* \*

> Apart from Additional Rent, if any, which the Trustee may receive (see "Acquisition and Lease Terms"), the residual value of the Equipment after the expiration of the [Master] Leases is the sole source of funds to which a Unitholder will have to look for a return of his capital investment in the Trust.

The Investment Memorandum also states:

> Except for the Trustee's right to collect
> the Additional Rent [i.e., Contingent Rent], any
> ultimate economic return to the Unitholders is
> dependent upon the residual value of the Equip-
> ment, if any, at the expiration of the terms of
> the [Master] Leases.

OPINION

This case involves a garden-variety computer leasing
tax shelter similar to others that the Court has held to be
shams.  See Estate of Strober v. Commissioner, T.C. Memo.
1992-350; Mele v. Commissioner, T.C. Memo. 1988-409;
Dobbs v. Commissioner, T.C. Memo. 1987-361; cf. Rubin v.
Commissioner, T.C. Memo. 1989-484.  There is nothing novel
in the transaction or the Court's opinion in response to
it.  In Robertson I, we held that petitioners had failed
to meet their burden of proving that the subject sale-
leaseback transaction was not a sham as had been determined
by respondent.  We considered both the economic substance
of the transactions, i.e., whether they offered a reason-
able opportunity for profit exclusive of tax benefits, and
petitioner's subjective business purpose for entering the
transactions, i.e., whether he had a profit objective or
purchased an interest in the trust solely to acquire tax
benefits.  See generally Gilman v. Commissioner, 933 F.2d
143, 147-148 (2d Cir. 1991), affg. T.C. Memo. 1990-205;

Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. in part, revg. in part and remanding T.C. Memo. 1987-628, Larsen v. Commissioner, 89 T.C. 1229 (1987), Sturm v. Commissioner, T.C. Memo. 1987-625, Moore v. Commissioner, T.C. Memo. 1987-626; Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985); Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 201-204 (1983), affd. in part, revd. in part, and remanded 752 F.2d 89 (4th Cir. 1985).

On the basis of all of the facts and circumstances presented, we found that petitioner's purchase of an interest in the Trust was without economic substance. That finding was based upon factors commonly reviewed in determining whether a computer leasing transaction possesses economic substance, including the presence or absence of arm's-length price negotiations, the reasonableness of the income and residual value projections, the structure of the financing, the degree of adherence to contractual terms, and, of particular significance in this case, the relationship between the sale price and fair market value of the property acquired. See Levy v. Commissioner, 91 T.C. 838, 856 (1988). In considering the last factor, we took note of "the limited nature of the

interest acquired" by the Trust.  Robertson I states as

follows:

> It is apparent that the Trust purchased interests from Systems that were stripped of much of their value.  The Trust held no right to the use of, or the proceeds from, the equipment until the expiration of the Initial User Leases. Further, the Trust held the right to receive only approximately half of the net rental proceeds from the equipment between the end of the Initial User Leases and the end of the Master Leases. The other half of the net rental proceeds would flow to the Equilease entities under the Master Leases.  Thus, the interests in the subject equipment were limited residual interests.

Thus, for purposes of evaluating the economic substance

of the transaction, we focused on the limited interest

acquired by the Trust rather than on the full fair market

value of the equipment involved.  We described that

interest as follows:

> that interest was essentially the ownership of the equipment after the expiration of the Master Leases plus the right to approximately half of the net rental stream between the end of the Initial User Leases and the end of the Master Leases.

This accords with the Investment Memorandum, quoted above,

and the testimony of petitioners' witnesses that the

economic benefit to the unitholders could arise only from

contingent rents and the residual value of the equipment at

the end of the master leases.  For example, Mr. Eli Gerver, one of the unitholders, testified as follows:

> Our expectation of profit came from two sources: the rents which might achieve, or our share of the rents that might be achieved after the--looking at that chart, that 60-month lease in the case of the Burroughs equipment, the 37-month in the First Computer, and the--whatever the other one is in the case of the foreign equipment, at the end of that, the possibility of renting to somebody else after that period time, or if that--and in addition to that, the residual, the ultimate opportunity to sell the equipment itself.

The trustee, Mr. Alan Bernikow, expressed the same idea as follows:

> The only way you can make money in this deal, when you go through the numbers, and we went through the numbers pretty quickly, is to recognize that the re-leasing program was very important, the value at the end was very important, because, if you don't have those pieces, all you have is taxes, that you pay in early years and you get back--you get in the early years and you pay back in the later years.
>
>     *   *   *   *   *   *   *
>
> We had gone through a due diligence and, once these numbers hit you, as you go through this package and recognize that if you believe in--in the rental incomes and the residual value, then it became a, what I would call--for the deals we saw at the time, a very good deal.

The experts who testified at the first trial on behalf
of each of the parties valued the contingent rents and
residual value of the equipment at the end of the master
leases as follows:

|  | Lyons Minimum | Lyons Maximum | Blumenthal |
|---|---|---|---|
| Contingent rent | $659,363 | $925,877 | $417,179 |
| Residual value | 8,135 | 470,074 | 10,000 |
| Total | 667,498 | 1,395,951 | 427,179 |

We adopted the view of respondent's expert, Mr. S. Paul
Blumenthal, that $427,179 was the maximum amount that would
be recouped by the unitholders.  Accordingly, we found that
they could not recoup their cash payment of $954,000 and,
thus, could not realize an economic profit.  This analysis
is similar to that applied in other court cases.  See
Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89
(4th Cir. 1985); Estate of Strober v. Commissioner, T.C.
Memo. 1992-350; Mele v. Commissioner, T.C. Memo. 1988-409;
Dobbs v. Commissioner, T.C. Memo. 1987-361.

There are several aspects of the testimony of
petitioners' expert, Mr. Esmond C. Lyons, Jr., that should
be noted.  First, the aggregate minimum economic benefit,
$667,498, and the aggregate maximum economic benefit,
$1,395,951, are both substantially less than the economic
benefit set forth in the Projections that accompanied the

Investment Memorandum (reproduced as appendix B hereto),

summarized as follows:

|  | Projections 20% | Projections 25% | Projections 30% |
|---|---|---|---|
| Contingent rent | $914,175 | $914,175 | $914,175 |
| Residual value | 930,671 | 1,163,338 | 1,396,006 |
| Total | 1,844,846 | 2,077,513 | 2,310,181 |

Second, the minimum residual value of the equipment

determined by petitioners' expert, $8,135, is less than

the residual value determined by respondent's expert,

$10,000.

In Robertson I, we also found that there was "a

complete lack of business purpose" for the transaction.

In that connection, we noted that petitioners and the

other unitholders "were partners and principals in a

major accounting firm * * * [and] Petitioner, as well as

other unitholders, had extensive experience with leasing

transactions."  Thus, we found that petitioner and the

other unitholders "should have understood that they were

agreeing to a grossly inflated price for their limited

interest in this equipment."

As stated above, the issue to be resolved in this

proceeding is whether the expert testimony presented on

petitioners' behalf during the second trial, together with

petitioners' arguments, convince us that we were mistaken

in Robertson I and that we should hold that petitioners are not liable for the additions to tax under sections 6653(a) and 6661. Petitioners' arguments require an analysis of the Appraisal of the subject computer equipment furnished by Mr. John R. Wilkins, president, Communigraphics, Inc., dated December 14, 1982, the Projections that were furnished to the unitholders, the Tax Opinion rendered by Austrian, Lance & Stewart, and the Investment Memorandum.

## The Appraisal

Mr. Wilkins' appraisal is broken into five sections: I. Scope of Study; II. Industry Background; III. Valuations; IV. Exhibit A:  Equipment Appraised; and V. Background & Qualifications of John R. Wilkins.  The "Equipment Appraised" section consists of four exhibits, lettered A through D, which enumerate each item of computer equipment and state the manufacturer's list price for each. Set out below is a description of the equipment appraised as set forth in IV. Exhibits A through D:

Exhibit A: Burroughs Wellcome

| Quantity | Unit | Model | Description | IBM List Price |
|---|---|---|---|---|
| 1 | IBM 3081 | D16 | Central Proces | $3,260,000 |
| 1 | IBM 3082 | 16 | Processor Cont | 220,000 |
| 1 | IBM 3087 | 1 | Coolant Dist. U | 60,000 |
| 1 | IBM 3278 | A02 | Console | 2,505 |
| | | | | 3,542,505 |

Exhibit B: Du Pont de Nemours (Deutschland) GmbH

| Quantity | Unit | Model | Description | IBM List Price |
|----------|------|-------|-------------|----------------|
| 2 | IBM 4341 | L01 | Central Proces | 450,000 |
| | | | | 450,000 |

Exhibit C: Du Pont de Nemours (Deutschland) GmbH

| Quantity | Unit | Model | Description | IBM List Price |
|----------|------|-------|-------------|----------------|
| 2 | IBM 3350 | A02 | Disk Drive | 83,200 |
| 1 | IBM 3350 | A2F | Disk Drive | 51,910 |
| 6 | IBM 3350 | B02 | Disk Drive | 197,640 |
| 3 | IBM 3350 | B2F | Disk Drive | 129,750 |
| 2 | IBM 3803 | 2 | Tape Control | 68,860 |
| 4 | IBM 3420 | 8 | Tape Drive | 110,380 |
| | | | | 641,740 |

Exhibit D: First Computer Corp.

| Quantity | Unit | Model | Description | CDC List Price |
|----------|------|-------|-------------|----------------|
| 1 | CDC 38340 | 2 | Controller w/2 Channel Sw. | -- |
| 2 | CDC 33502 | A2 | Disk Drive | -- |
| 6 | CDC 33502 | B2 | Disk Drive | -- |
| | | | | 418,891 |
| | Grand total | | | 5,053,136 |

We note that the Roscrea Trust allegedly agreed to purchase the equipment for $5,170,392.

The "Valuations" section of the appraisal, the most significant portion of the document for our purposes and the one that we refer to herein as the Appraisal, states as follows:

III.  Valuations

BURROUGHS WELLCOME COMPANY
DU PONT DE NEMOURS (DEUTSCHLAND) GmbH
FIRST COMPUTER CORPORATION

The IBM 3081 and 4341 Central Processors and the IBM and Control Data Corporation disk are the latest model in their price and capacity ranges, and should have an economic life of not less than twelve years.

Below is the anticipated residual value for the equipment described in Exhibits A-D upon the expiration of the initial user lease term and upon the expiration of 96 months:

             March, 1987 (Exh A)    - $1,062,751
             November, 1986 (Exh B) -    179,800
             November, 1985 (Exh C) -    261,855
             June, 1985 (Exh D)     -    188,502

The user leases are for 52 months at a rental of $92,676 per month (at a 16% debt interest rate) for Exhibit A; for 47 months at a rental of $8,659 per month (at a 12% assumed debt rate and a currency conversion rate of 2.496) for Exhibit B; 35 months at a rental of $10,375 per month (at a 12% assumed debt rate and a currency conversion of 2.496) for Exhibit C; and for 31 months at $7,500 per month (at a 16.75% debt rate) for Exhibit D.  The present value of the user lease is $4,331,327.

In our opinion, the assessed value of the equipment described in Exhibit A [sic] should be the sum of the present value of the user lease plus the present value of the residual value of such equipment upon expiration of the initial user lease term.  We have discounted such residual value at 16% and calculated the appraised value as follows:

Present value, user lease:                        $4,331,327
Present value, residual:   March, 1987 (Exh A)    - $519,763
                           November, 1986 (Exh B) -  112,763
                           November, 1985 (Exh C) -  181,205
                           June, 1985 (Exh D)     -  122,657
Sum of present values:                            $5,267,715

Since the sum of the Present Values exceeds the Acquisition Cost of the equipment, we will limit the appraisal to such Acquisition Cost.

Appraised Value:  $5,170,392

Respectfully submitted,


John R. Wilkins
President
Communigraphics, Inc.

It is readily apparent that the Appraisal is similar to another appraisal prepared by Mr. Wilkins that was in issue in Mele v. Commissioner, T.C. Memo. 1988-409. The appraisal in that case is virtually identical to the Appraisal at issue in this case, and it is worthwhile to compare the two. In that case, we described Mr. Wilkins' appraisal as "a summary of conclusory assertions [that] provides no substantial basis for measuring the soundness of projected residual values." Id. We also stated that "on its face Wilkins' appraisal was not a document worthy of reliance * * * [because it] is nothing more than a listing of unsupported conclusions as to the Equipment's value." Id.

The same is true in the instant case, but there are also glaring errors in Mr. Wilkins' Appraisal in this case that are apparent on its face and make reliance on it unreasonable. First, the second paragraph of the Appraisal states that there is set forth "the anticipated residual value for the equipment described in Exhibits A-D upon the expiration of the initial user lease term and upon the expiration of 96 months". To the contrary, however, the Appraisal provides only one set of values and makes no clear statement about whether the values provided are the residual values of the equipment upon expiration of the

initial user leases or the residual values of the equipment upon expiration of the 96-month term of the master leases. Presumably, Mr. Wilkins did not intend to say that the residual value of the equipment is the same on both dates.

Each of the values set forth in paragraph 2 of the Appraisal is accompanied by a month and year which appear to be the month in which each of the initial user leases terminates. From that, we assume that the values set out in paragraph 2 are the "residual" values of the equipment upon the expiration of the initial user leases. Thus, it appears that the Appraisal fails to provide residual values for the equipment upon expiration of the 96-month terms of the master leases.

By failing to set forth the residual value of the equipment upon expiration of the master leases, it is evident that Mr. Wilkins' Appraisal is based on a mistaken premise and is wrong. After setting forth the anticipated "residual" values of the equipment upon expiration of the initial user leases, Mr. Wilkins discounts those values in order to arrive at their present value in 1982, as follows:

```
Present value, residual:  Mar. 1987 (Exh A) - $519,763
                          Nov. 1986 (Exh B) -  112,763
                          Nov. 1985 (Exh C) -  181,205
                          June 1985 (Exh D) -  122,657

                              Total           936,388
```

To that amount, Mr. Wilkins adds the present value of the payments due under the initial user leases, $4,331,327, to arrive at the aggregate present value of the equipment, $5,267,715, an amount slightly in excess of the alleged acquisition cost of the equipment, $5,170,392.  Thus, the premise of the Appraisal is that the fair market value of the equipment sold to the Roscrea Trust is equal to the present value of the payments due under the initial user leases, $4,331,327, plus the aggregate present value of the residual values of the equipment upon the expiration of the initial user leases, $936,388.

However, upon expiration of each of the initial user leases, the computer equipment covered by that lease remained subject to one of the two master leases, and the unitholders could do nothing with that equipment until expiration of the master leases in 1990, other than to share with Equilease, the lessee under the master leases, any contingent rents realized.  Thus, in view of the fact that all of the equipment is subject to one of the two master leases, the Appraisal is wrong in valuing the equipment at the expiration of the initial user leases. Significantly, there is no evidence in the record that petitioners, the Trustee, or any of the other unitholders raised an issue with the seller of the equipment, the

appraiser, or any other person about the fact that the Appraisal is wrong on its face.

Furthermore, the failure of the Appraisal to set forth the residual value of the equipment upon expiration of the master leases is a serious omission because, as discussed above, the economic return on the investment to the unitholders depends primarily upon the residual value of the equipment at that time and not upon expiration of the initial user leases. As petitioner testified:

> the only way to make a profit in this trans-
> action, is to sell the Equipment at the end of
> the lease term [in 1990]; and that's what I was
> trying to do in becoming an investor in Roscrea
> Trust.

Before expiration of the master leases in 1990, the unitholders could receive fixed rents, equivalent in amount to the payments that the trust was obligated to make under the Trust Note, and a share of contingent rent. They could not realize the residual value of the equipment until after expiration of the 96-month master leases. By failing to provide the residual value of the equipment upon expiration of the master leases, the Appraisal is of limited assis- tance in computing the economic return on the investment to the unitholders. Once again, there is no evidence in the record that petitioners, the Trustee, or any of the

other unitholders raised an issue with the seller of the equipment, the appraiser, or any other person about the failure of the Appraisal to provide the residual value of the equipment at the expiration of the master leases.

We note other errors in the Appraisal.  As stated therein, the residual values of the equipment upon expiration of the initial user leases are discounted "at 16%" in order to obtain the present values.  In reviewing those computations, we noted two inconsistencies.  Our computations are set forth below:

|  | "Residual" Value | Months | Interest Rate | Present Value |
|---|---|---|---|---|
| Exh A | $1,062,751 | 54 | 16.00% | $519,763 |
| Exh B | 179,800 | 47 | 12.00 | [1]112,638 |
| Exh C | 261,855 | 37 | 12.00 | 181,205 |
| Exh D | 188,502 | 31 | 16.75 | 122,657 |
|  | 1,692,908 |  |  | 936,263 |

[1]This amount is $125 more than the amount in the appraisal, $112,763, which we were not able to duplicate.

From the above, the first inconsistency is that Mr. Wilkins used three interest rates in discounting the "residual" values at the expiration of the initial user leases, 16, 12, and 16.75 percent (referred to in the Appraisal as debt interest rate or assumed debt rate), rather than the single rate of 16 percent.  The second inconsistency is that

Mr. Wilkins used 54 months rather than 52 months and 37 months rather than 35 months for the number of months remaining before expiration of the initial user leases for Exhibits A and C, respectively.

Projections

The record contains two sets of financial projections that purport to summarize possible investment results to the Trust, one set dated December 10, 1982, reprinted herein as appendix A, and a second set dated December 16, 1982, reprinted herein as appendix B. We refer to either set or both sets as the Projections. The Projections dated December 10, 1982, were reviewed by petitioner and are described in Robertson I. The Projections dated December 16, 1982, were included as an attachment to the Investment Memorandum.

Both sets of Projections convey essentially the same information. They show that income would flow to the Trust from three sources: Rental income, referred to as fixed rent in the master leases, to be paid by Equilease over the 8-year term of the master leases; additional income, referred to as contingent rents in the master leases, to be derived from re-leasing the equipment after expiration of the initial user leases; and the "sale proceeds" from the sale of the equipment after expiration of the master

leases.  As mentioned above, the fact that the quarterly payments under the Trust Note equaled the fixed rent to be paid by Equilease meant that the Trust's income was effectively limited to two sources:  (1) The Trust's share of contingent rents and (2) the proceeds from the sale of the computer equipment at the end of the 96-month master leases.

The Projections show the cumulative after-tax benefit to the Trust on an aggregate basis assuming that the Trust realized additional income from contingent rents through the end of 1990 in the aggregate amount of $914,175 and further realized the proceeds from the sale of the computer equipment at the expiration of the master leases in the amounts set forth.  For example, if the Trust realized sale proceeds amounting to 20, 25, or 30 percent of original cost of the equipment less a 10-percent sales commission (i.e., $930,671, $1,163,333, or $1,396,006, respectively), the Projections dated December 16, 1982, show that the Trust would realize in 1990 a cumulative after-tax benefit of $950,507, $1,072,657, and $1,194,808, respectively.

Significantly, the forecasted sale proceeds used in the Projections are not based upon Mr. Wilkins' Appraisal or on the appraisal of any other independent appraiser. At the first trial, Mr. Scott Binder, who prepared the

Projections on behalf of the seller, could not explain why the anticipated sale proceeds of the equipment in 1990 are not set forth in the Appraisal, as was normally the case. Mr. Binder testified as follows:

> Q.   Now with respect to the line that says Sales Proceeds, where was that number or those numbers derived from?
>
> A.   I think the first number, the 20-percent number, comes from the appraisal.
>
> Because there is a possibility that it would be worth more and a possibility that it would--let me just see.
>
> He normally gave the estimated value.
>
> [Pause.]
>
> THE WITNESS:  I can't find it in here. Normally that was based on his--
>
> MR. WINNINGHAM:  Your Honor, could we ask what document the witness is referring to?
>
> THE WITNESS:  7-G [the Appraisal].
>
> MR. WINNINGHAM:  7-G, thank you.
>
> [Pause.]
>
> THE WITNESS:  I can't find it but it is supposed to be and it was based on appraisal at 20 percent and he somewhere comments I think that that's a fair number but anyway that's my answer--that it's based on Jack Wilkins.

Even more significantly, there is a critical discrepancy between the value of the computer equipment

used in the Projections and the value computed by the Appraisal.  According to Mr. Wilkins' Appraisal, the "present value" of the computer equipment in 1982 is $936,388.  On the other hand, the Projections assumed that, if the equipment were sold in 1990 at the end of the 96-month master leases, the proceeds from the sale would be $930,671, $1,163,338, or $1,396,006.  Clearly, if the proceeds from the sale of the equipment in 1990 are $930,671, $1,163,338, or $1,396,006, as contemplated in the Projections, then the equipment could not be worth $936,388 in 1982, as Mr. Wilkins opined in his Appraisal.  If we discount the three sale proceeds used in the Projections at 16 percent, the present values of the sale proceeds in 1982 are $260,959.20, $326,198.79, and $391,438.66.  Thus, there is a significant discrepancy between the value of the equipment as determined by Mr. Wilkins and the value of the equipment assumed in the Projections.  There is no evidence in the record that petitioners, the Trustee, or any of the other unitholders raised an issue about this discrepancy between the value of the equipment in the Projections and the Appraisal.

In passing, we note that the Projections contain a footnote D which states:  "At zero residual value the cumulative benefit amounts to 461905."  In the Projections

reprinted herewith as appendix B, we have added a column entitled "1990(D)" which shows the computation of that amount. We also note that there is no evidence that any of the unitholders considered the after-tax return to the Trust assuming that the Trust realized no contingent rents or proceeds from the sale of the equipment upon expiration of the master leases.

Tax Opinion

Petitioner and the other unitholders claim to have negotiated for and relied upon the Tax Opinion letter written by Austrian, Lance & Stewart to the Trustee that was attached as an exhibit to the Investment Memorandum. The Tax Opinion states that, in the opinion of Austrian, Lance & Stewart, "it is more likely than not that": (1) The Trust will be classified as a trust for Federal income tax purposes; (2) the master leases should not preclude the unitholders from being considered the owners of the equipment; (3) the unitholders' aggregate income tax basis in the computer equipment will be its purchase price represented by the cash downpayment and the face amount of the Trust Note; and (4) each unitholder will be "at risk" in an amount equal to his contributions when made plus the share of the Trust Note for which he is personally liable.

In rendering their opinion, Austrian, Lance & Stewart relied heavily upon the Appraisal prepared by Mr. Wilkins, described above.  For example, the Tax Opinion relies upon the Appraisal for the proposition that "the current fair market value of the Equipment is at least equal to the purchase price to be paid by the Trust".  The Tax Opinion also relies upon the Appraisal for the proposition that the equipment "should have a value at the end of the terms of the [Master] Leases (the 'residual value'), without regard to inflation, equal to or exceeding 20 percent of its cost."  Austrian, Lance & Stewart recite these facts in connection with their assumptions and representations at the beginning of the Tax Opinion in the following passage:

> Seller has provided the Trustee with a projection with respect to the present and anticipated future value of the Equipment (the "Appraisal") prepared by Communigraphics, Inc. (the "Appraiser").  The Appraiser believes that <u>the current fair market value of the Equipment is at least equal to the purchase price to be paid by the Trust</u> and will exceed the aggregate amount of the Trust Note and that the Unitholders can expect the Equipment to have a useful life extending beyond the terms of the Leases and that <u>it should have a value at the end of the terms of the Leases (the "residual value"), without regard to inflation, equal to or exceeding 20 percent of its cost</u>.  We are aware, however, that the data processing industry has been and is likely to continue undergoing rapid technological advances, some of which may substantially depress the economic value of the Equipment and limit its useful life.  We note specifically that the terms of the Leases, 96 months, is longer than most

leases of such equipment and may indicate that the anticipated residual value will not be realized.  In this regard, we have assumed that, as set forth in the Subscription Agreement, each of the Unitholders is investing in the Trust with a reasonable expectation of making a profit from his investment.  For purposes of the analysis that follows, we have assumed that the Appraisal is reasonable given all the facts and circumstances.  [Emphasis added.]

The fact that "the current fair market value of the Equipment is at least equal to the purchase price to be paid by the Trust" is essential to Austrian, Lance & Stewart's "understanding" concerning the reasonableness of earning an "economic profit" from the transaction as set out in the Tax Opinion as follows:  "It is our understanding that: * * * (ii) the Unitholders can reasonably expect to earn an economic profit from the Transaction based upon the Appraisal and the anticipated cash flow during and after the terms of the Lease".  This fact is also essential to Austrian, Lance & Stewart's conclusion that the amount of the Trust Note will be included in the unitholders' basis in the equipment, expressed in the Tax Opinion in the following passage:

Based upon our review of the proposed documents set forth above and our reliance upon the Appraisal indicating the fact that the Equipment will be sold by Seller for an amount not in excess of its then fair market value, we do not believe that there is a reasonable basis for concluding that the Service could successfully apply the principles of Marcus, May or the

>Revenue Rulings to the Trust's indebtedness on the Trust Note to Seller.
>
>*   *   *   *   *   *   *
>
>In contrast to the facts in <u>Franklin</u>, (i) the Unitholders will be personally obligated to pay the Trust Note, (ii) the Transaction will generate cash flow, if Additional Rent is paid, to the Trust and, therefore, to the Unitholders, (iii) the Trust Note will require no lump sum payments in the event of a default thereunder, in order completely to amortize the principal and (iv) <u>in the opinion of the Appraiser, the fair market value of the Equipment when purchased will not be less than its purchase price and the estimated residual value of the Equipment at the end of the Leases could be expected to be at least 20 percent of the purchase price</u>.
>[Emphasis added.]

As discussed above, however, it is apparent from the face of the Appraisal that the value determination made by the Appraisal is wrong. It is based upon the present value of the aggregate residual values of the equipment upon the expiration of the initial user leases, rather than upon the expiration of the 96-month master leases. Accordingly, the Appraisal cannot reasonably be relied upon to establish the fact that "the fair market value of the Equipment when purchased will not be less than its purchase price."

Second, the fact that the equipment "should have a value at the end of the terms of the [Master] Leases (the 'residual value'), without regard to inflation, equal to or exceeding 20 percent of its cost" is one of the key

factors on which Austrian, Lance & Stewart based their opinion that the unitholders would be considered the owners of the equipment. Furthermore, it is an important fact in Austrian, Lance & Stewart's opinion that the Trust Note would be included in the unitholders' basis in the equipment. However, as discussed above, Mr. Wilkins fails to set forth the residual value of the computer equipment as of the end of the master leases in the Appraisal.

Third, the Tax Opinion relies upon the Appraisal to establish "the anticipated cash flow during and after the term of the [Master] Lease." In addressing the issue of whether the unitholders would be considered the owners of the equipment, the Tax Opinion discusses whether the lease transaction would be recharacterized as a conditional sale of the equipment to the lessee or whether the Trust had retained a sufficient interest in the leased equipment to entitle it to depreciation deductions. In concluding that the leases "should not preclude the unitholders from being considered the owners of the Equipment", the Tax Opinion states the following as one of six factors on which that conclusion is predicated:

> the decision to acquire the Equipment has been
> made in reliance upon the Appraisal from an
> expert of the view that the Equipment would have
> a useful life beyond the end of the [Master]

Leases and have a residual value of not less than 20 percent of the purchase price.

In that connection, the Tax Opinion further states as follows:

> The Trustee anticipates receiving no positive cash flow during the initial term of the User Lease, additional cash flow thereafter depending upon receipt of any Additional Rent, which cannot be anticipated but may be significant. Upon expiration of the [Master] Lease [sic], the Equipment will be owned free and clear of all debt and the Appraisal anticipates the Unit-holders deriving a cash flow thereafter.

However, the Appraisal does not discuss the anticipated cash-flow from the computer equipment after expiration of the 96-month master leases.

Finally, the Tax Opinion relies upon the Appraisal to conclude that the equipment will have "a useful life extending beyond the terms of the [Master] Leases". Throughout the Tax Opinion, Austrian, Lance & Stewart note the importance of the useful life of the equipment in view of the 96-month terms of the master leases which "is longer than most leases of such equipment and may indicate that the anticipated residual value will not be realized." However, the only statement in the Appraisal that can be construed as addressing the "useful life" of the subject equipment is the following: "The IBM 3081 and 4341 Central

Processors and the IBM and Control Date [sic] Corporation disk are the latest model in their price and capacity ranges, and should have an economic life of not less than twelve years." This statement concerning the "economic life" of the equipment is not formulated in terms of Mr. Wilkins' considered opinion but appears to be an off-hand conclusory comment without anything to support it.

In summary, therefore, the Tax Opinion relies upon the Appraisal without question, even though there are glaring errors that are evident on the face of the Appraisal and a discrepancy between the value of the equipment in the Appraisal and in the Projections. The Tax Opinion also relies upon the Appraisal to establish facts, such as the residual value of the equipment upon expiration of the 96-month master leases, and the cash-flow from the equipment upon the expiration of the master leases, that are not stated in the Appraisal. Finally, the Tax Opinion relies upon the Appraisal to establish the "useful life" of the equipment, even though the statement in the Appraisal regarding the "economic life" of the equipment does not define the term "economic life" and appears to be an off-hand comment, rather than the considered opinion of the appraiser.

Investment Memorandum

Like the Tax Opinion, the Investment Memorandum relies upon the Appraisal's determination of the residual value of the equipment at the termination of the master leases even though the Appraisal does not provide such a value. For example, the Investment Memorandum states as follows:

> Based on the prices being paid for new and used data processing equipment and the terms of the end-user leases thereof, an appraisal by Communigraphics, Inc. which has been furnished by Seller projects that the Equipment will have value at the termination of the [Master] Leases more than sufficient to return to an investor his capital contribution to the Trust. * * *

Similarly, the Investment Memorandum states as follows:

> Unitholders are urged to review the Appraisal attached hereto as Exhibit E, which concludes that the Equipment will have a market value of not less than 20% of cost at the end of the terms of the [Master] Leases. There is, how- ever, no assurance that such value will exist or be realized at that time. (See "Equipment Appraisal--Exhibit E".)

These statements from the Investment Memorandum are obviously wrong and raise a red flag to any prudent investor reviewing the Investment Memorandum.

The Investment Memorandum also relies upon the Appraisal for the proposition that the fair market value of the equipment in 1982 is equal to the price paid by the

Trust.  For example, the Investment Memorandum states as follows:

>    The Trustee has received an appraisal that the fair market value of the Equipment as of December 14, 1982, is $5,170,392.00, which exceeds the amount of the Trust Note.  The debt will be includible in the basis of each Unit-holder to the extent of his liability therefor, but if the IRS should determine that the fair market value of the Equipment is less than its purchase price, the basis of the Unitholders in the Equipment would not include any part of the Trust Note.  The Unitholders' anticipated tax losses would be reduced almost entirely or totally eliminated.

>    The Tax Opinion concludes that it is more likely than not that the Trust Note will be includible in the Unitholders' basis in the Equipment, but that opinion is based upon the opinion expressed in the Appraisal that the fair market value of the Equipment exceeds the amount of the Trust Note.

Similarly, the Investment Memorandum states as follows: "The appraisal indicates that the fair market value of the Equipment as of December 14, 1982, exceeds the face amount of the Trust Note but there can be no assurance that such valuation will not be challenged by the IRS.  * * *"

The Investment Memorandum also warns that investors must be able to demonstrate that the fair market value of the computer equipment is at least equal to the purchase price, because, otherwise, "the IRS could disallow all of the deductions expected to be available to him, including depreciation and interest on the Trust Note, on the theory

that the Trust and the Unitholders do not have a deprecia-
ble interest in the Equipment and that the indebtedness has
no economic significance."  Notwithstanding the importance
of this issue, however, the Investment Memorandum relies
solely on the Appraisal to establish the fair market value
of the equipment, despite the obvious errors in the
Appraisal and the discrepancies between the Appraisal and
the Projections.

Finally, the Investment Memorandum relies upon the
Appraisal to establish the "useful life" of the equipment,
as follows:

> Further, the Appraisal indicates that the
> Equipment will have a residual value sufficient
> for the Unitholders to realize a profit and that
> the Equipment will have a useful life in excess
> of the terms of the [Master] Leases.

The Investment Memorandum notes that the useful life of the
equipment is especially important because "the 96 month
term of the [Master] Leases may be challenged by the IRS as
being for a term which is substantially all of the useful
life of the Equipment."  Nevertheless, as discussed above,
the Appraisal merely states that the computer equipment
"should have an economic life of not less than 12 years"
and fails to define the term "economic life".

Section 6653(a)(1) and (2)

Robertson I held petitioners liable for the additions to tax under section 6653(a)(1) and (2) that were determined by respondent in the notice of deficiency. Petitioners bear the burden of proving that respondent's determination of negligence is wrong.  See Rule 142(a); Hansen v. Commissioner, 820 F.2d 1464, 1469 (9th Cir. 1987).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of any under-payment is due to negligence or intentional disregard of rules or regulations.  For purposes of this section, negligence is defined as the "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances."  Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part per curiam T.C. Memo. 1964-299).

Section 6653(a)(2) imposes an additional amount "equal to 50 percent of the interest payable under section 6601 * * * with respect to the portion of the underpayment described in paragraph (1) which is attributable to * * * negligence".  This addition applies to "the period beginning on the last date prescribed by law for payment

of such underpayment * * * and ending on the date of the assessment of the tax".  Sec. 6653(a)(2)(B).

## Section 6661

Robertson I also held petitioners liable for the addition to tax under section 6661 that was determined by respondent in the notice of deficiency.  Petitioners bear the burden of proving that respondent's determination is wrong.  See Rule 142(a).

Section 6661(a) provides that, if there is a "substantial understatement of income tax", there shall be added to the tax an amount equal to 25 percent of any underpayment attributable to such understatement.  An "understatement" is the amount by which the tax required to be shown on the return for the taxable year exceeds the amount of tax shown on the return.  Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  See sec. 6661(b)(1)(A).  As determined in Robertson I, the understatement of tax in this case, $16,135, is greater than both of those amounts.

Generally, the amount of the understatement is reduced by that portion of the understatement which is attribut-able to the tax treatment of any item if there is or was substantial authority for such treatment, or the tax

treatment of any item with respect to which the relevant facts affecting the item's tax treatment are adequately disclosed in the return or in an attached statement.  See sec. 6661(b)(2)(B).  In the case of a tax shelter, however, the reduction for adequate disclosure does not apply, and the reduction based upon substantial authority for the treatment of the item does not apply unless the taxpayer reasonably believed at the time the return was filed that the tax treatment claimed "was more likely than not the proper treatment."  Sec. 6661(b)(2)(C)(i).  A taxpayer can establish such a reasonable belief if the taxpayer in good faith relies on the opinion of a professional tax adviser that unambiguously states that the tax adviser "concludes that there is a greater than 50-percent likelihood that the tax treatment of the item will be upheld in litigation if the claimed tax treatment is challenged by the Internal Revenue Service."  Sec. 1.6661-5(d)(2), Income Tax Regs. Therefore, in the case of an understatement attributable to a tax shelter, a taxpayer must prove that:  (1) There was substantial authority for the tax treatment of an item; and (2) the taxpayer reasonably believed that the tax treatment of an item was more likely than not the proper treatment. See sec. 6661(b)(2)(C)(i); Mele v. Commissioner, T.C. Memo. 1988-409.

Petitioners argue that the Court should vacate that portion of Robertson I relating to the additions to tax under sections 6653(a) and 6661 and hold that petitioners are not liable for those additions to tax. As to the additions under section 6653(a)(1) and (2), petitioners assert that the Court should hold that petitioners are not subject to liability under those provisions because: (1) Petitioners reasonably relied in good faith on the Tax Opinion contained in the Investment Memorandum and on the tax advice of one of their partners, Mr. Gerver; (2) they "conducted an independent evaluations [sic] [of the investment] that corroborated the information provided in the memorandum, the Projections, and the Appraisal"; (3) the information provided to petitioners and the other unitholders reasonably could not have been expected to suggest that the unitholders did not have a reasonable prospect of qualifying for the expected tax consequences of the transaction; and (4) at the time they entered into the investment there was a substantial market for equity investments in computer equipment leasing transactions with many offering tax benefits exceeding those anticipated from the investment in issue.

As to the additions to tax under section 6661, petitioners assert that the Court should hold that petitioners

are not subject to liability under that provision for two reasons. First, petitioners argue that the amount of the "understatement" should be reduced by the entire understatement because petitioners satisfied the substantial authority and reasonable belief requirements of section 6661(b)(2)(B) and (C). To establish substantial authority and reasonable belief, petitioners rely on the same arguments, summarized above, that they advanced to show that they are not liable for the negligence additions under section 6653(a)(1) and (2). Second, petitioners maintain that they meet the standards for waiver of the addition to tax under section 6661(c), which provides that the Secretary may waive all or any part of the section 6661 addition if the taxpayers prove that there was reasonable cause for the understatement and they acted in good faith.

Finally, as to the additions to tax under both sections 6653(a) and 6661, petitioners argue that the Court should vacate those portions of our opinion relating to additions to tax under sections 6653(a) and 6661 because the Court's holding that the investment did not have economic substance was based upon the novel theory that petitioners acquired a limited or partial interest, rather than an entire ownership interest, in the computer equipment.

In their testimony, petitioner and the other unit-holders paint a picture of a close-knit group of partners in a major national accounting firm joining together to investigate and negotiate an investment in computer equipment that was the subject of the sale-leaseback transaction described above. Under this view of the facts, one of petitioner's fellow unitholders, Mr. James Crumlish, negotiated the terms of the purchase of the computer equipment, including an appraisal of the equipment by an independent appraiser and a tax opinion. Petitioner and his fellow unitholders then relied upon the professional expertise of various members of the group to "corroborate" the economic benefits and tax consequences of the investment described in the Investment Memorandum, Appraisal, Projections, and Tax Opinion.

Petitioners argue that they relied upon the Tax Opinion supplied by the seller, the tax advice of Mr. Gerver, and the expertise of other partners of the accounting firm, such as Messrs. William Atkins and Charles Biggs. Petitioners assert that Messrs. Atkins and Biggs were responsible for reviewing and corroborating the value and the useful life of the computer equipment to be purchased, and that Mr. Gerver and others were responsible for reviewing the Tax Opinion and corroborating the tax

consequences of the transaction.  Petitioners argue that nothing in the Investment Memorandum, Tax Opinion, Projections, or Appraisal should have caused petitioners or any of the unitholders to doubt the reasonableness of their expectation of profit from the transaction.  In fact, according to petitioners, the subject transaction offered fewer tax benefits than those offered by other computer leasing transactions at the time.  Furthermore, according to petitioners, an investor would not have entered into the subject investment solely for tax purposes because the investor would suffer a loss if there were no contingent rents or proceeds from the sale of the equipment.

 We are unable accept petitioners' view of the facts for the following reasons.  First, as discussed above, our review of the Appraisal, Projections, Tax Opinion, and Investment Memorandum shows that there are serious questions that would have been evident to a reasonable investor reviewing those documents.  For example, among other things, an investor would have certainly questioned the fact that the Appraisal fails to provide the residual value of the equipment upon expiration of the master leases, the fact that there is a discrepancy between the value of the computer equipment determined by the Appraisal and the value used in the Projections, and the fact that

the Tax Opinion states that it relies upon the Appraisal regarding the residual value of the equipment and cash-flow therefrom on or after the end of the master leases, despite the failure of the Appraisal to provide any such determination.  Considering the problems that we noted in the documents relating to this transaction, which are described above, we do not believe that it would be reasonable for an investor to rely on the Tax Opinion, nor do we believe that an investor who did so would be acting in good faith.  See Mele v. Commissioner, T.C. Memo. 1988-409.

Second, according to the testimony of petitioner and five other unitholders, at least 10 partners of the accounting firm were actively involved in analyzing the Investment Memorandum and the other documents relating to the subject investment.  Mr. Crumlish also testified that "associates" of the accounting firm were involved in "looking at the projections and making sure that those projections were, you know, properly calculated and that the assumptions weren't unreasonable and that type of thing."  Notwithstanding that alleged scrutiny by sophisticated accountants and lawyers, none of the unit-holders who testified at the first trial detected any of the problems with the Appraisal, the Tax Opinion,

the Projections, or the Investment Memorandum that are described above.  None of the unitholders noted the fact that the Appraisal fails to set out the residual value of the computer equipment at the expiration of the master leases and incorrectly values the equipment using the "residual value" of the equipment upon the expiration of the initial user leases.  None of the unitholders noted the discrepancy between the value of the computer equipment determined in the Appraisal and the value of the equipment used in the Projections.  None of the unitholders noted the fact that the Tax Opinion relies upon the Appraisal to establish the fact that the amount paid by the Trust for the computer equipment was the fair market value of the equipment despite the obvious errors in the Appraisal. Even more significant, none of the unitholders noted the fact that the Tax Opinion relies upon the Appraisal to establish facts that are not stated in the Appraisal, such as the residual value of the computer equipment upon expiration of the master leases and the cash-flow from the equipment after expiration of the master leases.

We are simply unable to credit much of the testimony of petitioner and his fellow unitholders regarding their alleged "independent evaluation" of the subject investment. We do not believe that petitioner and his fellow

unitholders could have given the Investment Memorandum and related documents the level of scrutiny to which they testified without noting the problems described above.

Third, there are numerous inconsistencies in the testimony of petitioner and his fellow unitholders. For example, Mr. Crumlish testified that, in his negotiations with the seller, he insisted upon receiving an independent appraisal of the equipment because of the importance of the residual value of the equipment. Mr. Crumlish also testified that the group "relied" on the Appraisal. We find it hard to believe that Mr. Crumlish, having negotiated with the seller to provide an appraisal, did not raise an issue with the seller or anyone else about the missing residual value of the equipment or raise a question about the discrepancy between the value of the equipment in the Projections and the Appraisal. It suggests that the Appraisal and other documents were merely window dressing.

Mr. Crumlish also testified that he obtained the Appraisal and provided it to another unitholder, Mr. Atkins, who had expertise regarding computer equipment. Surprisingly, Mr. Atkins testified that he "did not confer with Mr. Crumlish" nor did he send him anything in writing.

Petitioner and his fellow unitholders testified that they relied upon Messrs. Atkins and Biggs regarding the

value of the equipment and its useful life.  Generally, we found the testimony of both Messrs. Atkins and Biggs to be vague and conclusory.  For example,  Mr. Atkins testified as follows regarding his review of the Appraisal:

> Q.    Mr. Atkins, you said that you reviewed the
>       offering materials in connection with the
>       Roscrea Trust, in 1982.  Did you look at any
>       appraisal information that was included with
>       that material?
>
> A.    There was an appraisal from a company,
>       Computer Graphics, or computer--something
>       like that.
>
> Q.    And what was your view of the appraisal that
>       you received from this company?
>
> A.    I feel that the appraisal was fair, given
>       the current situation of the equipment.
>
>             *    *    *    *    *    *    *
>
> Q.    Did you think it was appropriate to obtain
>       another appraisal, apart from the appraisal
>       that had been supplied with the offering
>       materials?
>
> A.    No.
>
> Q.    Why?
>
> A.    It looked--in my opinion, it looked
>       reasonable.
>
> Q.    As far as the price of the equipment; what
>       was your opinion about that?
>
> A.    The--in terms of the price of it, here
>       again, in my opinion, it looked realistic,
>       but one of the things about the group that
>       were investing in this thing, is that I
>       could seek other opinions, and which I did.

Q.  Let me just focus on the cost of the IBM
    equipment.  How did you determine whether
    that price was a fair price that was being
    paid by the individuals involved in the
    Roscrea Trust?

A.  Well, by basically looking at the prices
    that were in the--in the appraisal and
    generally dealing with what my knowledge was
    in the market place, and in conversations
    with people.

             *   *   *   *   *   *   *

Q.  Just focusing on the pricing for the moment.
    Who did you speak with in connection with
    that, just with the cost of the equipment?

A.  The cost of the equipment?  With Biggs.

Q.  And what was your determination about--view
    about the cost of the equipment that was
    going to be involved in the Roscrea Trust?

A.  It was reasonable.

             *   *   *   *   *   *   *

Q.  You read the whole investment memo?

A.  I read the investment memo, except for the
    part that was a very technical tax piece of
    the memo.  I did not read that.

Q.  Did you read the appraisal that came along
    with the investment memo?

A.  Yes.

Q.  Did you question the appraisal?

A.  Did I question it?  No.

Q.  You took it at face value?

A.  I took it at the value after I applied
    my judgment to it, yes.

Q.    How do you--how did you come to a judgment?

A.    As I've stated on--previously, in looking at
      what I think the value of the equipment is
      and the value of it being on lease, and the
      fact that it was going to be a long-term
      lease, that's the value that I placed on it.

Q.    Did you look at any particular documents?

A.    No.

Q.    Reports?

A.    No.

Q.    Did you look at anything, such as the IDC
      Services?

A.    No.

Q.    Did you look at any computer economic
      residual value services?

A.    No, I didn't.

Q.    Did you look at Gartner Services?

A.    Gartner.  Not at that time.


Mr. Biggs testified that he paid little or no attention to

the Appraisal of the subject equipment.

     The subject equipment included a large mainframe, the

IBM 3081, a smaller central processor, the IBM 4341, and

peripheral equipment, such as disk drives, that was

manufactured by Control Data Corp.  Mr. Biggs testified

regarding the useful life of the subject computer equipment

as follows:

Q. Sir, you spoke about the particular equip-
ment that you were considering investing in.
Did you reach any conclusions with respect
to the potential useful life of that
equipment?

A. Well, my conclusions were that the useful
life would be in excess of 10 years for
the equipment that was in question.

Mr. Biggs did not explain whether his judgment regarding

the useful life of the equipment "in excess of 10 years"

applied to each piece of equipment or was an average of

some kind.  He also did not state when the useful life

began.  For example, a 10-year useful life of the IBM 3081

which, according to his testimony, was introduced in 1980

would mean that the end of the useful life was in 1990,

the expiration of the master leases.  This suggests that

the IBM 3081 would have little or no residual value upon

expiration of the master leases.

Similarly, Mr. Atkins testified regarding the

"economic life" of the IBM 3081 as follows:

Q. Can you put a--Did you determine or have an
opinion about the length of the economic
life that could be forecast for this IBM
equipment; again focusing on the IBM 3081?

A. I think the 3081 will have a life cycle of
about 10 years in the market place.  That
does not mean that all of them sold will be
there 10 years later, but there will be
enough in the market place there.  They'll
still be on lease.

Q.    And this was your view in 1982 I take it?

A.    Right.

Mr. Atkins' opinion regarding the "economic life" of the IBM 4341 is as follows:

Q.    In 1982, did you have an opinion of the
economic life of the IBM 4341?

A.    The 4341 is more easily replaced and, I felt
confident that at that time, at least
through the life of the lease, it was, it
would be a valuable product.

Mr. Atkins provided no testimony regarding the useful life of the peripheral equipment manufactured by Control Data Corp.  Mr. Atkins acknowledged that he did no research in arriving at his opinion regarding the "economic life" of the IBM 3081 and the IBM 4341 but based his opinion on his years of experience.

Furthermore, the testimony of Messrs. Atkins and Biggs regarding the "economic life" of the equipment does not corroborate petitioner's testimony that the "useful life" of the IBM 3081 would range from 10 to 15 years. Petitioner testified as follows:

Q.    What part, or what did you consider the
economical life of the equipment that you
were acquiring or going to acquire to play
in the decision to invest?

A.   Atkins and Biggs advised me that the 3081 useful life could be, and would likely be in the range of 10 to 15 years.  So, I believe, in my mind, I was using 12 years, in my assessment of what we might realize on the residuals at the end of the leases.

We cannot find as a fact that petitioners relied upon tax advice from petitioner's partner, Mr. Gerver. Mr. Gerver testified as follows:

Q.   Did you write that out, give that in writing? Did you give the tax opinion in writing?

A.   If I'm giving an opinion, I have to put it in writing.  An oral opinion, as you know, isn't worth the paper it's written on.

Q.   Did you give a tax opinion in this case?

A.   To who?

Q.   To Petitioner?

A.   No, we spoke about it.  I discussed it with him and I told him that, from what I could see, the tax issues were the ones that were familiar to me, I didn't think that there was any tax issue that we had to be con- cerned about that they did not cover, but they didn't cover such as, for example, the opinion, as I recall, makes no mention that this is a transaction entered into for profit.  I said I felt that since that's where we were going, everything was a transaction entered into for profit, and I didn't think we need an opinion to that effect.

Q.   So you gave nothing to the taxpayer in writing, is that correct?

A.   No.

Q. Did you give a tax opinion to the trust in this case?

A. No I wasn't asked for an opinion from the trust. When I came to the trust it was as an investor.

Mr. Gerver further testified it was not necessary for him to render a separate opinion regarding the tax consequences of the investment because he "felt that everything was covered more than adequately by the opinion that had been provided by Austrian."

As we understand Mr. Gerver's testimony, he approached the subject investment "as an investor" and, while he discussed the investment with petitioner, he did not undertake to render professional advice to petitioner. He never put his analysis of the investment in writing, and the record does not suggest that petitioner paid Mr. Gerver to advise him.

Moreover, there is no evidence in the record that Mr. Gerver raised with petitioner or anyone else the problems with the documentation of the investment that are described above. To the contrary, he testified at trial that he read the Tax Opinion "carefully" and that he also read the Appraisal, the Projections, and the Investment Memorandum. Despite the obvious problems and questions that readily appear from a review of these documents,

problems and questions that should have been obvious to any one of the unitholders, Mr. Gerver failed to note any of them.  For this reason, if Mr. Gerver undertook to advise petitioner, we do not believe that reliance on his advice would have been reasonable and in good faith.

For the above reasons, we also reject petitioners' claim that they are not liable for the substantial understatement addition to tax on the ground that they meet the standard for waiver under section 6661(c).  We do not agree that they have shown either a "reasonable cause for the understatement" or that they "acted in good faith."  Sec. 6661(c).

Finally, we do not agree with petitioners' assertion that the additions to tax under sections 6653(a) and 6661 should not apply "because the Court's holding in Robertson I is based upon the novel theory that Petitioner acquired a limited or partial interest, rather than an entire ownership interest, in the Computer Equipment." Petitioners fail to recognize that in Robertson I we were evaluating the economic substance of the transaction in order to determine whether the transaction was a sham, as had been determined by respondent.  In that connection, we noted the limited nature of the interest that had been acquired by the trust and evaluated the economic substance

of the transaction accordingly by comparing the cash payment made by the Roscrea Trust, $954,000, with the maximum amount that the unitholders could expect to recoup, $427,179.

An analysis similar to our analysis in Robertson I was made by the Court in Gilman v. Commissioner, T.C. Memo. 1989-684, affd. 933 F.2d 143 (2d Cir. 1991).  Gilman involved a sale-leaseback of computer equipment that was held to lack economic substance.  In holding that the transaction did not offer a reasonable opportunity for economic profit exclusive of tax benefits, the Court made the following analogy:

> In essence, petitioner claims to have purchased a
> Christmas tree, but actually only purchased the
> right to hang some ornaments on a tree that was
> already in place and serving its full useful and
> economic purpose, and to take possession of the
> tree after the Christmas holidays.

See also Estate of Strober v. Commissioner, T.C. Memo. 1992-350, where the Court makes the same analysis and quotes extensively from Gilman v. Commissioner, supra.

For the reasons stated above, we sustain respondent's determination of the additions to tax under section 6653 (a)(1) and (2) for negligence or intentional disregard of rules or regulations and the additions to tax under section 6661(a) for substantial understatement of income tax.

Motion in Limine

Respondent objects to the testimony of petitioners' "expert" witnesses, Mr. Raynault and Professor Mundstock, on the ground that, if they are fact witnesses, then their testimony is not acceptable under rule 602 of the Federal Rules of Evidence, because they have no personal knowledge of the facts at issue and, if they are "expert witnesses", then their testimony is not admissible under rule 702 of the Federal Rules of Evidence, because it would not assist the trier of fact.  We agree.

Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The report and testimony of neither of the witnesses who testified on petitioners' behalf at the second trial involved "scientific, technical, or other specialized knowledge" that would assist the Court as "the trier of fact to understand the evidence or to determine a fact in issue".  Fed. R. Evid. 702.  The burden of Mr. Raynault's report and testimony is that the documents supplied to

the unitholders of the Roscrea Trust, consisting of the Investment Memorandum, the Projections, the Tax Opinion, and the Appraisal, were "reasonable and consistent" with the documents supplied by other "packagers" of similar investments, and the activities undertaken by the unitholders to review and investigate the subject investment were "reasonable and consistent" with what other investors did.  Mr. Raynault does not acknowledge any of the problems identified by the Court.  His report and analysis are simply an extension of the argument made by petitioners' counsel.

Similarly, the gist of the report and testimony of Professor Mundstock is that the Tax Opinion provided in the Investment Memorandum "addressed the issues which were then the focus of the community of tax professionals who advised investors in such transactions" and the opinions stated therein "were consistent with the opinions experienced tax counsel were providing to investors in similar investments".  Professor Mundstock also fails to acknowledge any of the problems identified by the Court and described above.

Our rejection of petitioners' position that they are not liable for the additions to tax under sections 6653(a) and 6661 is based entirely upon the factual record made

during the first trial in this case. Our opinion sustaining respondent's determination of the additions to tax would be the same whether we accept the subject testimony in evidence or not. However, we find the report and testimony of each of petitioners' "experts" during the second trial, Mr. Raynault and Professor Mundstock, to lack the objectivity and credibility which we expect from experts who testify in this Court. Both witnesses became advocates for the position argued by petitioners in their reports and testimony, and we find them to be of no assistance in making our findings of fact in this case. In this situation, we agree with respondent that the reports and testimony should not be received in evidence. See Snap-Drape, Inc. v. Commissioner, 105 T.C. 16, 20 (1995), affd. 98 F.3d 194 (5th Cir. 1996); Laureys v. Commissioner, 92 T.C. 101, 122-129 (1989).

Rule 155 Computation

As amended by an order of the Court, Robertson I directed that the Court's decision be entered under Rule 155. In due course thereafter, respondent filed respondent's computation for entry of decision under Rule 155, and petitioners filed petitioners' objection to entry of respondent's decision under Rule 155. Both parties also filed memoranda setting forth their positions.

Petitioners object to respondent's computation of the deficiency in, and additions to, petitioners' 1984 tax on two grounds. First, respondent failed to give petitioners any credit in 1984 for taxes paid with respect to the income from the Roscrea Trust reported on their returns for the years 1987 through 1990. Petitioners refer to income from the Trust that was reported on their returns for the years 1987 through 1990 as "phantom income". Second, respondent failed to recognize in computing petitioners' 1984 taxes the "economic loss" of $57,420 that petitioners suffered by reason of their cash investment in the Roscrea Trust.

Petitioners ask the Court to order respondent to take those items into account (i.e., "phantom income" reported for the years 1987 through 1990 and petitioners' cash investment) in computing their liability for taxes, interest, additions, and penalties with respect to the year in issue in this case, 1984, and the years in issue in other docketed cases, 1982, 1983, and 1985. According to petitioners, their request "is consistent with this Court's inherent powers, general equitable principles, and clear Congressional intent--as well as common sense notions of judicial economy and sound tax administration."

As to the phantom income, petitioners ask the Court to order respondent to take into account "the income Petitioners reported from the Roscrea Trust transaction in later years and the overpayments that result from the reporting of that income." (Emphasis added.) None of the "later years", viz, 1987 through 1990, is before the Court in this proceeding, however, and section 6214(b) deprives us of jurisdiction to determine whether the tax for any of those years has been overpaid or underpaid.

We do not agree with petitioners' argument that application to 1984 of later years' overpayments (if any) is necessary because otherwise "the amount of the deficiency for 1984 will be incorrectly overstated --in a manner inconsistent with this Court's Opinion". The issue presented for decision in Robertson I was whether petitioners were entitled to deductions in 1984 for accelerated depreciation on the computer equipment purchased by Roscrea Trust and for the interest paid on the indebtedness incurred by the Trust to purchase such equipment. The deficiency computed in petitioners' 1984 tax, attributable to the disallowance of such deductions, is not affected by the issue whether petitioners had overstated their income in a later year by including rental income from the equipment. In accordance with our annual

system of reporting income and expenses, the tax attributable to each year stands on its own. See <u>Security Flour Mills Co. v. Commissioner</u>, 321 U.S. 281, 286 (1944); <u>Bank of Commerce v. Commissioner</u>, 10 B.T.A. 73 (1928).

Similarly, we do not agree that the additions to tax "cannot be properly calculated without taking into account income reported and taxes paid by Petitioners in subsequent years." The additions to tax in this case, the negligence additions under section 6653(a) and the addition to tax for substantial understatement of liability under section 6661(a), are both computed without regard to the "income reported and taxes paid by Petitioners in subsequent years." In the case of the negligence additions under section 6653(a), the amount of the additions is a percentage of the "underpayment" as defined by section 6653(c). In the case of the addition to tax for substantial understatement of liability under section 6661(a), the addition is 25 percent of "any underpayment" attributable to an "understatement".

We disagree with petitioners' contention that in order to give full effect to our holding that the transaction was a sham in substance, we must compute petitioners' tax liability on a transactional basis. Our decision not to offset the deductions and losses in earlier

years (1982-85) against "phantom income" reported in later years from the Trust transaction is consistent with our holding in Robertson I.  In <u>Kazi v. Commissioner</u>, T.C. Memo. 1991-37, affd. without published opinion sub nom. <u>Massey v. Commissioner</u>, 950 F.2d 723 (3d Cir. 1991), the Court refused to accept the taxpayers' argument that the deficiency attributable to a straddle loss should be reduced by the amount of any tax paid on the corresponding straddle gain reported in a subsequent year.  The Court stated:

> Our holding * * * that the straddle transactions
> were shams in substance does not imply that the
> loss reported in one year must be offset by the
> corresponding gain reported in a subsequent year.
> Therefore, the elimination of the gain and loss
> legs in the year each gain or loss was reported
> gives full effect to our holding that the
> straddle transactions were shams.  [<u>Id.</u>]

As mentioned above, petitioners also argue that respondent's computation is wrong because it fails to recognize petitioners' cash investment of $57,420 in the Roscrea Trust.  They contend that, according to the Court's opinion, petitioners acquired a partial interest in the computer equipment, and they are entitled to depreciation deductions with respect to the amount of their actual cash investment.  We disagree.

We agree with respondent that under our holding that the transaction was a sham in substance, petitioners are not entitled to recognition of their cash investment of $57,420 in the form of depreciation deductions. See Gilman v. Commissioner, T.C. Memo. 1989-684 (on the basis of the Court's finding that the transaction lacked economic substance and business purpose, all of the taxpayer's depreciation deductions were disallowed with no offset allowed for the taxpayer's cash investment of $45,000); Mele v. Commissioner, T.C. Memo. 1988-409 (on the basis of the Court's finding that the transaction lacked economic substance, all of the taxpayer's depreciation deductions were disallowed with no offset for taxpayer's cash invest-ment of $88,700). Accordingly, we sustain the Rule 155 computation submitted by respondent.

Upon consideration of the foregoing,

An appropriate order will be issued, and decision will be entered in accordance with respondent's Rule 155 computation.

Appendix A

ROSCREA TRUST
IBM, 3081, IBM PERIPHERALS, CONTROL DATA DISK DRIVES
COST $5,170,392

| 10-Dec-82 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990(D) | 1990(E) | 1990(F) | 1990(G) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental income | | $820,445 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 | $986,133 |
| Additional income (A) | | | | 1,675 | 30,000 | 117,500 | 260,000 | 260,000 | 245,000 | 245,000 | 245,000 | 245,000 |
| Sale proceeds | | | | | | | | | | 930,671 | 1,163,338 | 1,396,006 |
| Total income | | 820,445 | 986,133 | 987,808 | 1,016,133 | 1,103,633 | 1,246,133 | 1,246,133 | 1,231,133 | 2,161,804 | 2,394,471 | 2,627,139 |
| Depreciation (B) | $795,713 | 1,207,342 | 1,055,787 | 981,156 | 951,294 | 119,400 | 59,700 | | | | | |
| Interest | 36,698 | 657,280 | 638,147 | 579,445 | 510,365 | 429,552 | 335,012 | 224,414 | 96,072 | 96,072 | 96,072 | 96,072 |
| Total expenses | 832,411 | 1,864,622 | 1,693,934 | 1,560,601 | 1,461,659 | 548,952 | 394,712 | 224,414 | 96,072 | 96,072 | 96,072 | 96,072 |
| Taxable income | (832,411) | (1,044,177) | (707,801) | (572,793) | (445,526) | 554,681 | 851,421 | 1,021,719 | 1,135,061 | 2,065,732 | 2,298,399 | 2,531,067 |
| Cash-flow | | | | | | | | | | | | |
| Tax benefit (Liability)(C) | 416,205 | 522,089 | 353,900 | 286,396 | 222,763 | (277,340) | (425,710) | (510,860) | (567,531) | (1,032,866) | (1,149,200) | (1,265,533) |
| Rental cash-flow | | | | 1,675 | 30,000 | 117,500 | 260,000 | 260,000 | 245,000 | 245,000 | 245,000 | 245,000 |
| Sale proceeds | | | | | | | | | | 930,671 | 1,163,338 | 1,396,006 |
| Gross benefit | 416,205 | 522,089 | 353,900 | 288,071 | 252,763 | (159,840) | (165,710) | (250,860) | (322,531) | 142,805 | 259,138 | 375,472 |
| Less: capital invested | 954,000 | | | | | | | | | | | |
| Annual benefit | (537,795) | 522,089 | 353,900 | 288,071 | 252,763 | (159,840) | (165,710) | (250,860) | (322,531) | 142,805 | 259,138 | 375,472 |
| Reinvest. @ 10% | | (27,675) | 13,357 | 46,791 | 78,512 | 91,009 | 83,833 | 71,388 | 49,857 | 73,124 | 78,940 | 84,757 |
| Cumulative benefit (D) | (537,795) | (43,381) | 323,876 | 658,738 | 990,013 | 921,182 | 839,305 | 659,833 | 387,159 | 875,761 | 997,911 | 1,120,062 |

(A) THIS FIGURE ESTIMATES THE RELEASING REVENUES BEGINNING IN MONTH 37.
(B) CALCULATED USING ACCELERATED COST RECOVERY SYSTEM GUIDELINES FOR FOREIGN AND DOMESTIC PROPERTY.
(C) ASSUMES A 50% TAX RATE.
(D) AT ZERO RESIDUAL VALUE THE CUMULATIVE BENEFIT AMOUNTS TO 387,159.
(E) ASSUMES A SALE PRICE OF 20% LESS A 10% SELLING COMMISSION.
(F) ASSUMES A SALE PRICE OF 25% LESS A 10% SELLING COMMISSION.
(G) ASSUMES A SALE PRICE OF 30% LESS A 10% SELLING COMMISSION.

ROSCREA TRUST
IBM, 3081, IBM PERIPHERALS, CONTROL DATA DISK DRIVES
COST $5,170,392

| 16-Dec-82 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 | 1989 | 1990(D) | 1990(E) | 1990(F) | 1990(G) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rental income | | $675,770 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 | $1,043,128 |
| Additional income (A) | | | | 1,675 | 30,000 | 117,500 | 260,000 | 260,000 | 245,000 | 245,000 | 245,000 | 245,000 |
| Sale proceeds | | | | | | | | | | 930,671 | 1,163,338 | 1,396,006 |
| Total income | | 675,770 | 1,043,128 | 1,044,803 | 1,073,128 | 1,160,628 | 1,303,128 | 1,303,128 | 1,288,128 | 2,218,799 | 2,451,466 | 2,684,134 |
| Depreciation (B) | $795,713 | 1,207,342 | 1,055,787 | 981,156 | 951,294 | 119,400 | 59,700 | | | | | |
| Interest | 27,901 | 712,377 | 688,706 | 625,506 | 551,037 | 463,289 | 359,893 | 238,060 | 94,502 | 94,502 | 94,502 | 94,502 |
| Total expenses | 823,614 | 1,919,719 | 1,744,493 | 1,606,662 | 1,502,331 | 582,689 | 419,593 | 238,060 | 94,502 | 94,502 | 94,502 | 94,502 |
| Taxable income | (823,614) | (1,243,949) | (701,365) | (561,859) | (429,203) | 577,939 | 883,535 | 1,065,068 | 1,193,626 | 2,124,297 | 2,356,964 | 2,589,632 |
| Cash-flow | | | | | | | | | | | | |
| Tax benefit (Liability)(C) | 411,807 | 621,975 | 350,683 | 280,930 | 214,602 | (288,970) | (441,768) | (532,534) | (596,813) | (1,062,149) | (1,178,482) | (1,294,816) |
| Rental cash-flow | | | | 1,675 | 30,000 | 117,500 | 260,000 | 260,000 | 245,000 | 245,000 | 245,000 | 245,000 |
| Sale proceeds | | | | | | | | | | 930,671 | 1,163,338 | 1,396,006 |
| Gross benefit | 411,807 | 621,975 | 350,683 | 282,605 | 244,602 | (171,470) | (181,768) | (272,534) | (351,813) | 113,522 | 229,856 | 346,190 |
| Less: capital | 954,000 | | | | | | | | | | | |
| Annual benefit | (542,193) | 621,975 | 350,683 | 282,605 | 244,602 | (171,470) | (181,768) | (272,534) | (351,813) | 113,522 | 229,856 | 346,190 |
| Reinvest. @ 10% | | (23,121) | 23,200 | 57,185 | 89,264 | 101,847 | 94,369 | 81,091 | 57,983 | 81,250 | 87,066 | 92,883 |
| Cumulative benefit (D) | (542,193) | 56,661 | 430,544 | 770,334 | 1,104,200 | 1,034,577 | 947,178 | 755,735 | 461,905 | 950,507 | 1,072,657 | 1,194,808 |

(A) THIS FIGURE ESTIMATES THE TRUST'S PORTION OF THE RELEASING REVENUES BEGINNING IN MONTH 37.
(B) CALCULATED USING ACCELERATED COST RECOVERY SYSTEM GUIDELINES FOR FOREIGN AND DOMESTIC PROPERTY.
(C) ASSUMES A 50% TAX RATE.
(D) AT ZERO RESIDUAL VALUE THE CUMULATIVE BENEFIT AMOUNTS TO $461,905.
(E) ASSUMES A SALE PRICE OF 20% LESS A 10% SELLING COMMISSION.
(F) ASSUMES A SALE PRICE OF 25% LESS A 10% SELLING COMMISSION.
(G) ASSUMES A SALE PRICE OF 30% LESS A 10% SELLING COMMISSION.